J-S01036-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| GARY WILLIAMS, | : | |
| | : | |
| Appellant | : | No. 288 MDA 2016 |

Appeal from the Judgment of Sentence January 26, 2016
in the Court of Common Pleas of Lackawanna County,
Criminal Division, No(s): CP-35-CR-0001294-2012

BEFORE: GANTMAN, P.J., DUBOW and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.: **FILED MARCH 29, 2017**

Gary Williams ("Williams") appeals from the judgment of sentence imposed following his (1) conviction of two counts each of recklessly endangering another person and terroristic threats, and one count each of aggravated assault and simple assault; and (2) guilty plea to persons not to possess firearms.[1] Additionally, Williams has filed a Motion for change of court-appointed counsel. We deny Williams's Motion, affirm Williams's convictions, vacate his judgment of sentence, and remand for entry of an amended sentencing order granting Williams additional credit for time served.

---

[1] **See** 18 Pa.C.S.A. §§ 2705, 2706(a)(1), 2702(a)(1), 2701(a)(1) and 6105(a)(1).

In its Opinion, the trial court set forth the relevant factual and procedural history, which we adopt for the purpose of this appeal. ***See*** TrialCourt Opinion, 11/3/16, at 2-21.[2]

On June 30, 2016, Williams filed a court-ordered Pa.R.A.P. 1925(b) Concise Statement of matters complained of on appeal. The trial court thereafter issued its Pa.R.A.P. 1925(a) Opinion.

On appeal, Williams raises the following issues for our review:

1. Was the Commonwealth's evidence sufficient to establish every element of the crimes charged beyond a reasonable doubt?

2. Did the [t]rial [c]ourt err in allowing the Commonwealth to offer evidence [that Williams] was abusive toward Gloria Soto [("Gloria"),] and had punched her on a prior occasion[,] to show an escalation of events and demonstrate [Williams's] motive, malice, intent and ill will toward [Gloria]?

3. Did the [t]rial [c]ourt err in denying [Williams's] pre[-]sentence [M]otion to withdraw his guilty plea to [p]ersons not to [p]ossess or [c]ontrol [f]irearms[,] where [Williams] offered fair and just reasons for the withdrawal of his guilty plea?

4. Did the [t]rial [c]ourt err in denying [Williams's] [M]otion to withdraw his guilty plea to [p]ersons not to [p]ossess or

_____

[2] In its Opinion, the trial court indicated that Williams was sentenced on the federal charges on August 27, 2014. ***See*** Trial Court Opinion, 11/3/16, at 4. However, both the Commonwealth and Williams assert that the federal sentencing occurred on August 28, 2014. Additionally, the state sentencing Order awarded Williams credit for time served from the date of his arrest to August 28, 2014, which suggests that this is the correct date for the federal sentencing. Accordingly, we have referred to the federal sentencing date herein as August 28, 2014, and conclude that the trial court's reference to August 27, 2014, was in error.

[c]ontrol [f]irearms[,] where [the] prosecution was barred by 18 Pa.[]C.S.A. § 111 and double jeopardy principles?

5. Did the [t]rial [c]ourt err in disregarding evidence of taint[,] and in finding Xander Soto [("Xander")] competent to testify?

6. Did the [t]rial [c]ourt err in failing to hold a hearing regarding Gloria['s] competency to testify?

7. Did the [t]rial [c]ourt err in failing to hold a **Grazier**[3] hearing[,] and in refusing to allow [Williams] to waive counsel?

8. Did the [t]rial [c]ourt impose an illegal sentence by sentencing [Williams] to an aggregate term of 79 to 120 months' imprisonment[,] and by failing to give him proper credit for time[]served?

Brief for Appellant at 5 (footnote added, issues renumbered for consistency with presentation of issues in Williams's appellate brief).

In his first issue, Williams contends that the evidence was insufficient to convict him of aggravated assault. *Id*. at 14. Williams points to the Criminal Complaint, and asserts that this charge was based on the allegation that he struck Gloria on the head multiple times with the butt of his rifle. *Id*. at 15. Williams asserts that, because Gloria recanted her statement that Williams struck her on the head with the butt of his rifle, the Amended Information alleged that Williams struck Gloria on the head with "an object." *Id*. at 15-16. Williams argues that "the Commonwealth failed to prove [that] Williams caused Gloria [] to be struck in the forehead with an object[,] and also failed to establish the identity of the object[,] or show how

---

3 **Commonwealth v. Grazier**, 713 A.2d 81 (Pa. 1998).

its alleged use, or intended use, was calculated or likely to produce death or serious bodily injury." *Id*. at 16. Williams points to Gloria's trial testimony, and contends that she did not observe Williams strike her with an object, and could not identify the object that struck her. *Id*. at 17. Williams asserts that, because Gloria could not identify the object, there was no basis for the jury to find that the object was a deadly weapon. *Id*. at 18. Williams claims that, even if the jury determined that Williams had struck Gloria with a dresser drawer, it was not an inherently dangerous or lethal device, and the prosecution introduced no evidence to support a finding that its use was calculated to produce death or serious bodily injury. *Id*. Williams argues that no dresser drawer was recovered from the scene or admitted into evidence, and Gloria did not testify about the size, shape or weight of the dresser drawer, or about the velocity of the object and the force of its impact. *Id*. Williams further contends that "[b]ecause Gloria [] suffered only superficial injury, the force of impact was obviously minimal." *Id*.

Williams also asserts that the evidence was insufficient to convict him of terroristic threats against Xander. *Id*. at 19. Williams claims that, at the preliminary hearing, Gloria and Xander testified only that Williams had threatened to kill Gloria, if she disrespected his friends again. *Id*. Williams points to the transcript of Gloria's 9-1-1 call, and argues that she made no reference to Xander, and stated only that Williams was going to kill her. *Id*. Williams also points to Gloria's trial testimony, and contends that she made

no reference to a threat against Xander, and stated only that Williams had threatened to kill her if she did not clean the house. *Id*. Williams claims that Xander was in his bedroom during the argument, and that this fact "further undermines [Xander's] claim he heard Williams threaten to kill him and his mother." *Id*.

Williams additionally contends that the evidence was insufficient to sustain his conviction of assault because the Commonwealth failed to prove that he struck Gloria with an object. *Id*. at 20.

Williams further asserts that the evidence was insufficient to sustain his conviction of recklessly endangering Xander because he was not in the room when Williams discharged his rifle into Gloria's bedroom wall, near her head. *Id*. at 22. Williams claims that the bullet penetrated the bedroom wall, but did not enter the bathroom located on the opposite side of that wall. *Id*. Williams argues that, when the rifle discharged, Xander was in his bedroom located across the hall from Gloria's bedroom, and "it was impossible for him to have been placed in danger of death or serious bodily injury." *Id*. at 22-23.

In its Opinion, the trial court addressed Williams's first issue, set forth the relevant law, and determined that the issue lacks merit. *See* Trial Court Opinion, 11/3/16, at 21-28. We agree with the reasoning of the trial court, which is supported by the evidence of record when viewed in the light most

favorable to the Commonwealth, and affirm on this basis as to Williams's first issue. ***See id***.

In his second issue, Williams contends that the trial court erred by permitting the Commonwealth to introduce evidence of Williams's prior violence against Gloria. Brief for Appellant at 24. Williams asserts that there was only one prior incident of domestic abuse, which allegedly occurred ten months prior to the incident in question. ***Id***. at 30. Williams further asserts that, because Gloria never reported the incident to police, no police reports, court filings or restraining orders were offered into evidence to establish the date of the incident or corroborate the testimony of Gloria and Xander regarding the abuse. ***Id***. Williams claims that, even if the testimony of Gloria and Xander is deemed sufficient, the isolated prior incident was insufficient to establish a pattern or history of abuse, so as to establish Williams's motive, malice, intent or ill will toward Gloria. ***Id***.

Williams also argues that, even if evidence of the prior incident was admissible under Pa.R.E. 404(b),[4] it should have been excluded because its probative value was outweighed by the potential for unfair prejudice. Brief for Appellant at 31. Williams contends that, instead of determining whether the Commonwealth had met its burden of proving the crimes for which he was charged, the jury may have convicted him based on his propensity to engage in criminal behavior. ***Id***. at 32. Williams asserts that "his guilt or

---

[4] Pa.R.E. 404(b) sets forth the permissible and prohibited uses of evidence of a person's prior bad acts.

innocence must be established by evidence relevant to the particular offense for which he is on trial; not by showing he was an abusive man who[,] in the past[,] abused Gloria …." *Id*. Williams claims that, because the jury found him not guilty of aggravated assault for firing a rifle at Gloria's head, the trial court abused its discretion by admitting evidence of his prior abuse of Gloria. *Id*. at 33. Williams argues that, even though Gloria recanted her statement that Williams hit her in the head several times with the butt of his rifle, the jury nevertheless found him guilty of aggravated assault for striking her in the head with an object. *Id*. Williams contends that the admission of prior incidents of his verbal and physical abuse toward Gloria "created a latent hostility [towards him] in the minds of the jury[,] which caused the jury to convict him of aggravated assault … and the remaining charges." *Id*.

In its Opinion, the trial court addressed Williams's second issue, set forth the relevant law, and determined that the issue lacks merit. *See* Trial Court Opinion, 11/3/16, at 28-34. We discern no abuse of discretion by the trial court, and affirm on this basis as to Williams's second issue. *See id*.[5]

In his third issue, Williams contends that the trial court improperly denied his request to withdraw his guilty plea to persons not to possess

---

[5] Even if the evidence of Williams's past abuse of Gloria had been improperly admitted, we would have concluded that such admission was harmless. *See Commonwealth v. Levanduski*, 907 A.2d 3, 21 (Pa. Super. 2006) (concluding that an error was harmless where the properly admitted and uncontradicted evidence of guilt was so overwhelming, and the prejudicial effect of the error so insignificant by comparison, that the error could not have contributed to the verdict).

firearms.  Brief for Appellant at 34.  Williams asserts that his admission of guilt for unlawfully possessing a firearm was made under duress, and coercion by his trial counsel.  *Id*. at 36.  Williams claims that he also sought to withdraw his guilty plea so that he could challenge the legality of the search and seizure of the rifle.  *Id*.  Williams argues that, "[b]ecause the Commonwealth alleged no prejudice, the [t]rial [c]ourt's subjective belief that Williams's request to withdraw his guilty plea was a dilatory tactic[,] or that his defense was implausible[,] were not proper grounds to deny relief."  *Id*.  Williams contends that, because the trial court could have sentenced him on the remaining charges, it erred in denying his request to withdraw his guilty plea to the firearms charge.  *Id*. at 38.

The standard of review that we employ in challenges to a trial court's decision regarding a pre-sentence motion to withdraw a guilty plea is well-settled: "[a] trial court's decision regarding whether to permit a guilty plea to be withdrawn should not be upset absent an abuse of discretion.  An abuse of discretion exists when a defendant shows any 'fair and just' reasons for withdrawing his plea absent 'substantial prejudice' to the Commonwealth."  *Commonwealth v. Pardo*, 35 A.3d 1222, 1227 (Pa. Super. 2011) (citation omitted).

In its Opinion, the trial court addressed Williams's third issue, set forth the relevant law, and determined that the issue lacks merit.  *See* Trial Court

Opinion, 11/3/16, at 38-42. We discern no abuse of discretion by the trial court, and affirm on this basis as to Williams's third issue. ***See id***.

In his fourth issue, Williams contends that the trial court erred by denying his request to withdraw his guilty plea to persons not to possess firearms under 18 Pa.C.S.A. § 6105(a)(1) because the prosecution was barred by 18 Pa.C.S.A. § 111[6] and the double jeopardy clauses of Article 1, § 10 of the Pennsylvania Constitution and the Fifth Amendment to the United States Constitution from prosecuting that charge. Brief for Appellant at 39. Williams asserts that the persons not to possess firearms charge was substantially the same crime as, and arose from the same conduct underlying, his prior federal conviction of unlawful possession of a firearm under 18 U.S.C. § 922(g)(1). Brief for Appellant at 39. Williams claims that both charges were based on the same conduct; "namely[,] his unlawful possession of the [] rifle that was shipped to [] Gloria['s] residence and allegedly used to fire a bullet into her bedroom wall …." ***Id***. at 42. Although Williams concedes that his conviction under 18 U.S.C. § 922(g)(1) required the additional element that the firearm had traveled in interstate commerce, he nevertheless argues that this element is a "mere formality." Brief for Appellant at 42. Williams contends that, because the legislative purpose of

---

[6] Pursuant to section 111, when conduct constitutes an offense within the concurrent jurisdiction of Pennsylvania and of the United States or another state, a prosecution in any such other jurisdiction is a bar to a subsequent prosecution in Pennsylvania if certain enumerated circumstances apply. ***See*** 18 Pa.C.S.A. § 111.

both offenses is the same, the trial court placed him twice in jeopardy by denying his pre-sentence Motion to withdraw his guilty plea to persons not to possess firearms. *Id*. at 43-44.

In its Opinion, the trial court addressed Williams's fourth issue, set forth the relevant law, and determined that the issue lacks merit. *See* Trial Court Opinion, 11/3/16, at 34-38. We discern no abuse of discretion by the trial court, and affirm on this basis as to Williams's fourth issue. *See id*.; *see also Commonwealth v. Williams*, 151 A.3d 1113, 1117 (Pa. Super. 2016) (holding, under similar circumstances, that the trial court properly denied the defendant's motion, under 18 Pa.C.S.A. § 111, to dismiss the charge of persons not to possess a firearm, because 18 Pa.C.S.A. § 6105(a)(1) and 18 U.S.C. § 922(g)(1) each (1) requires proof of a fact the other does not; and (2) targets harms that differ substantially in scope).

In his fifth issue, Williams contends that he filed a Motion challenging Xander's competency, and requesting a taint hearing. Brief for Appellant at 46. Williams asserts that the testimony provided at the preliminary hearing established that Xander was in his bedroom on the night in question, and did not observe any of the events at issue. *Id*. Williams claims that Xander's testimony was tainted by his exposure to media and interactions with his mother, law enforcement personnel and members of the district attorney's office. *Id*. at 46-47. Williams argues that Xander was not questioned by the trial court or counsel regarding his recollection of the events in question,

and the trial court made no determination regarding Xander's ability to perceive the events or his capacity to remember and describe past events. *Id*. at 48. Williams contends that the trial court "erred and abused its discretion in summarily concluding [that] Xander [] was competent to testify." *Id*. Williams also asserts that he made a sufficient showing of taint to warrant specific questions regarding Xander's conversations with his mother, law enforcement personnel and members of the district attorney's office about the events at issue. *Id*. at 48-49.

In its Opinion, the trial court addressed Williams's fifth issue, set forth the relevant law, and determined that the issue lacks merit. *See* Trial Court Opinion, 11/3/16, at 46-49. We discern no abuse of discretion by the trial court, and affirm on this basis as to Williams's fifth issue. *See id*.

In his sixth issue, Williams contends that he filed a Motion challenging Gloria's competency to testify on the basis that her mental conditions, use of antidepressant and psychotropic medications, and illicit use of heroin rendered her incapable of perceiving events accurately and recalling them correctly. Brief for Appellant at 50-51. Williams points to several inconsistencies in Gloria's testimony, and claims that such inconsistencies demonstrate that her ability to observe an event and recall it accurately was adversely affected by her mental illness and illicit drug use. *Id*. at 51-52, 53. Williams asserts that the trial court erred by failing to conduct a hearing

regarding Gloria's competency to testify, thereby causing prejudice to his case. *Id*. at 51, 53.

In its Opinion, the trial court addressed Williams's sixth issue, set forth the relevant law, and determined that the issue lacks merit. *See* Trial Court Opinion, 11/3/16, at 49-51. We discern no abuse of discretion by the trial court, and affirm on this basis as to Williams's sixth issue. *See id*.

In his seventh issue, Williams contends that he made a timely request to waive counsel, and to proceed *pro se*. Brief for Appellant at 56. Williams claims that the trial judge questioned Williams regarding portions of his written waiver of counsel colloquy, and advised Williams that no ruling would be made on his request until trial. *Id*. at 56-57. Williams argues that, despite the trial judge's representation that he would question Williams regarding the remainder of the waiver of counsel colloquy before trial, the trial judge failed to do so, and also failed to conduct a *Grazier* hearing. *Id*. at 58.

In its Opinion, the trial court addressed Williams's seventh issue, set forth the relevant law, and determined that the issue lacks merit. *See* Trial Court Opinion, 11/3/16, at 43-45. We discern no abuse of discretion by the trial court, and affirm on this basis as to Williams's seventh issue. *See id*.

In his final issue, Williams contends that the trial court failed to give him proper credit for time served. Brief for Appellant at 60. Williams claims that the pre-sentence investigation report erroneously indicated that he

began serving a legal sentence upon his sentencing on the federal charges. *Id*. Williams argues that he has not commenced service of his federal sentence, and, accordingly, the trial court erred by failing to give him credit for the time he served in state prison from his federal sentencing on August 28, 2014, to his state sentencing on January 26, 2016.[7] *Id.* at 61. Williams disputes the Commonwealth's assertion that this period of imprisonment should be credited to Williams's federal sentence. Reply Brief for Appellant at 5. Williams asserts that, pursuant to the doctrine of primary jurisdiction, he has remained exclusively in the Commonwealth's custody, and has not been released to federal custody or begun to serve his federal sentence. *Id*. at 7. Williams claims that he will receive no credit toward his federal sentence for the time he remained in state prison following his federal conviction and prior to his state sentencing. *Id*.[8]

Under the doctrine of primary jurisdiction, the sovereign which first arrests a defendant has primary jurisdiction over him. ***See Newsuan v. Pa.***

---

[7] At the time of his sentencing on the state charges, Williams was given credit for time served of 821 days, representing the period in which he was in state custody from his arrest on May 30, 2012, to his federal sentencing on August 28, 2014.

[8] Williams also contends that, because his minimum aggregate prison sentence is more than half of his maximum aggregate prison sentence, his sentence is illegal under 42 Pa.C.S.A. § 9756(b)(1) (providing that the minimum sentence of confinement imposed shall not exceed one-half of the maximum sentence imposed). Brief for Appellant at 59. However, our review of the record discloses that Williams's minimum aggregate prison sentence (79 months) did not exceed one-half of his maximum aggregate prison sentence (180 months). *See* Trial Court Opinion, 11/3/16, at 21. Thus, we find no merit to this claim.

***Dep't of Corr.***, 853 A.2d 409, 411 (Pa. Cmwlth. 2004).  As explained by the

Commonwealth Court in ***Newsuan***,

> [t]he doctrine of primary jurisdiction is a means for resolving jurisdictional disputes between [] sovereigns. … ***Chambers v. Holland***, 920 F. Supp. 618, 622 (M.D. Pa. [1996]), *aff'd*, 100 F.3d 946 (3d Cir. 1996).  Primary jurisdiction remains vested in the sovereign that first arrested the defendant until it relinquishes its priority of jurisdiction by, *e.g.*, bail release, dismissal of the state charges, parole release, or expiration of the sentence.  [***Id***.] at 622 (citing ***United States v. Warren***, 610 F.2d 680, 684-85 (9th Cir. 1980) and ***Roche v. Sizer***, 675 F.2d 507, 510 (2d Cir. 1982)).  Thus, when a federal court and state court each have jurisdiction of a defendant, the doctrine of primary jurisdiction allows the tribunal which first obtained jurisdiction to hold it to the exclusion of the other until the first tribunal's jurisdiction is exhausted.  ***In re Liberatore***, 574 F.2d 78, 88 (2d Cir. 1982).
>
> When a state has primary jurisdiction, as is the case here, primary jurisdiction over a defendant ends and federal custody over him commences only when the state authorities relinquish him on satisfaction or extinguishment of the state obligation. ***Chambers***, 920 F. Supp. at 622 (citing ***United States v. Smith***, 812 F. Supp. 368, 370 (E.D.N.Y. 1993) and ***Thomas v. Whalen***, 962 F.2d 358, 361 n.3 (4th Cir. 1992)).  The federal sentence does not commence until the defendant is received into custody at the official detention facility at which the sentence is to be served.  18 U.S.C. § 3585(a); ***United States v. Pungitore***, 910 F.2d 1084, 1118-[]19 (3d Cir. 1990), *cert. denied*, 500 U.S. 915, 114 L. Ed. 2d 98, 111 S. Ct. 2009, 111 S. Ct. 2010, 111 S. Ct. 2011 (1991)[] ("a federal sentence does not begin to run until the defendant is delivered to the place where the sentence is to be served").

***Newsuan***, 853 A.2d at 411-12.

Our review of the record reflects that, on May 30, 2012, the Scranton

City Police Department filed a Criminal Complaint against Williams, and he

was arrested by Scranton police on that same date.  Thus, primary

jurisdiction vested in the Commonwealth, as the sovereign that first arrested Williams. *See Newsuan*, 853 A.2d at 411; *Chambers*, 920 F. Supp. at 622. Williams was unable to post bail, and remained in the Lackawanna County Prison following his arraignment. At some point, Williams was transferred to SCI Coal Township, where he presently remains. Neither the trial court nor the Commonwealth dispute that Williams remained in state custody from the date of his arrest, on May 30, 2012, to his sentencing on the state charges on January 26, 2016. Thus, despite Williams's conviction of the federal offenses, for which he was sentenced on August 28, 2014, he remained in state custody, and subject to the Commonwealth's primary jurisdiction. Williams's federal sentence did not begin to run upon his federal sentencing because the Commonwealth did not relinquish its priority of jurisdiction over him, nor was he delivered to the official federal detention facility where his federal prison sentence is to be served. *See Newsuan*, 853 A.2d at 412; 18 U.S.C. § 3585(a). Accordingly, we conclude that Williams is entitled to additional credit for time served for the period between his federal sentencing, on August 28, 2014, and his state sentencing on January 26, 2016.

We therefore affirm Williams's convictions, but vacate his judgment of sentence and remand for entry of an amended sentencing order granting Williams additional credit for time served for the period between his federal

sentencing, on August 28, 2014, and his state sentencing on January 26, 2016.[9]

With respect to Williams's Motion for change of court-appointed counsel, we deny the Motion without prejudice to refile the Motion in the trial court, upon remand.

Motion for change of court-appointed counsel denied. Judgment of sentence vacated; case remanded for entry of an amended sentencing order granting Williams additional credit for time served, consistent with this Memorandum. Superior Court jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/29/2017

---

[9] In its Opinion, the trial court addressed Williams's final issue, and determined that Williams is entitled to additional credit for time served. **See** Trial Court Opinion, 11/3/16, at 59. However, the trial court calculated the additional time served to be merely 152 days, which is patently erroneous.

COMMONWEALTH OF
PENNSYLVANIA

    v.

GARY WILLIAMS

:     IN THE COURT OF COMMON
:     PLEAS OF LACKAWANNA
:     COUNTY
:
:
:     12 CR #1294
:

## OPINION

### BARRASSE, P.J.

This opinion is filed pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate

Procedure and pursuant to the request of the Superior Court. Defendant Gary Williams (herein

after "Defendant") appeals this Court's January 26, 2016, Judgment of Sentence.  Appellant's

issues on appeal are as follows, *verbatim*:

1. The Commonwealth's evidence was insufficient as a matter of law to establish Defendant's guilt beyond a reasonable doubt of the crimes charges in following counts of the Amended Information, to wit: Count 2: Aggravated Assault, in violation of 18 Pa C.S.A. 2702(a)(4); Count 3: Terroristic Threats, in violation of 18 Pa C.S.A. 2706(a)(1); Count 4: Terroristic Threats, in violation of 18 Pa C.S.A. 2706(a)(1); Count 5: Simple Assault, in violation of 2701(a)(1); Count 6: Recklessly Endangering another Person, in violation of 18 Pa C.S.A. 2705; and Count 7: Recklessly Endangering another Person in violation of 18 Pa C.S.A. 2705.
2. The Trial Court committed legal error and/or abused its discretion in the following respects: (a) in granting the Commonwealth's Motion in Limine to introduce Rule 404(b) evidence, regarding Defendant's prior incidents of domestic violence against Gloria Soto from August 2011, through May 2012, to show ill will, motive, intent and common scheme or plan and a chain or sequence of events to form the history of the case; (b) in allowing the Commonwealth to introduce evidence and testimony that Defendant had punched Gloria Soto in the face on a prior occasion to show an escalation of violence; and (c) in denying Defendant's Counter Motion in Limine to preclude the Commonwealth from introducing evidence regarding prior incidents of domestic violence because the evidence was limited to a single occurrence, and did not involve firearms or show a sequence of events, and the probative value of such evidence was far outweighed by its potential for unfair prejudice.
3. The Trial Court erred and abused its discretion in denying Defendant's oral motion placed on-the-record in open court before sentencing to withdraw his guilty plea to the charge of Persons not to Possess or Control Firearms, 18 Pa C.S.A. 6105(a)(1), and in

1

sentencing Defendant on such charge, because prosecution was barred by 18 Pa C.S.A. 111, and by the double jeopardy clauses of Article 1, 10 of the Pennsylvania Constitution and the Fifth Amendment to the United States Constitution, in that Defendant's prior federal conviction for Unlawful Possession of a Firearm, in violation of 18 U.S.C. 922(g)(1), is substantially the same as the crime of Persons not to Possess or Control Firearms, 18 Pa. C.S.A. 6105(a)(1), and the charges arose from the same offense conduct.

4. The Trial Court erred and abused its discretion in denying Defendant's oral motion placed on-the-record in open court before sentencing to withdraw his guilty plea to the charge of Persons not to Possess or Control Firearms, 18 Pa. C.S.A. 6105(a)(1), because Defendant offered fair and just reasons for the withdrawal of his guilty plea, amounting to an assertion of innocence, and the Commonwealth suffered no prejudice.

5. The Trial Court erred and abused its discretion in failing to hold a Grazier hearing, regarding Defendant's request to waive counsel, and in failing to allow Defendant to waive counsel and proceed *pro se* in this matter.

6. The Trial Court erred and abused its discretion in failing to consider evidence of taint and in finding that Xander Soto was competent to testify and in allowing said witness to testify for the Commonwealth where Xander Soto lacked the capacity to observe, perceive and recall events correctly and accurately and his testimony was tainted by outside sources.

7. The Trial Court erred and abused its discretion in failing to hold a hearing regarding Gloria Soto's competency to testify and in allowing said witness to testify for the Commonwealth because Gloria Soto could not perceive events accurately or remember them correctly due to her mental or emotional condition, use of antidepressant and psychotropic medications and illicit use of heroin.

8. The Trial Court imposed an illegal sentence by directing that Defendant undergo confinement at a state correctional institution for an aggregate minimum term of 79 months' imprisonment to a maximum term of 120 months' imprisonment, followed by eight years' special probation, and by failing to give Defendant proper credit for time-served.

For the following reasons, based on a review of the record, the applicable law, the character and history of the Defendant, and the facts of the case, Defendant has failed to establish that he is entitled to relief. Therefore, this Court's January 26, 2016 Judgment of Sentence should be affirmed.

## FACTUAL AND PROCEDURAL HISTORY

Under Docket Number CP-35-CR-0001294-2012, the Defendant was charged with one (1) count of Aggravated Assault (F1) in violation of **18 Pa. C.S.A. § 2702(a)(1)**, one (1) count of

2

Aggravated Assault (F2) in violation of **18 Pa. C.S.A. § 2702(a)(1)**, two (2) counts of Terroristic Threats with Intent to Terrorize Another (M1), in violation of **18 Pa C.S.A. § 2706(a)(1)**, one (1) count of Simple Assault (M2), in violation of **18 Pa. C.S.A. § 2701(a)(1)**, two (2) counts of Recklessly Endangering Another Person (M2), in violation of **18 Pa. C.S.A. § 2705**, one (1) count of Persons not to Possess or Control Firearms (M1) in violation of **18 Pa. C.S.A. § 6105(a)(1)**, Harassment – Subject Other to Physical Contact (S) in violation of **18 Pa. C.S.A. § 2709(a)(1)**, one (1) count of Discharging a Firearm into an Occupied Structure (F3) in violation of **18 Pa. C.S.A. §2707.1(a)**, one (1) count of Disorderly Conduct Engage in Fighting (M3) in violation of **18 Pa.C.S.A. § 5503(a)(1)**, and one (1) count of Simple Assault (M2) in violation of **18 Pa. C.S.A. § 2701(a)(2)**.

These charges stemmed from a March 29, 2012 incident in which Scranton Police Officers received notice to respond to the Valley View Housing Project in Lackawanna County for a gun call. **McLane, Affidavit of Probable Cause, May 30, 2012.** It was alleged that the Defendant shot a firearm at his girlfriend, victim/witness Gloria Soto, and threatened to kill her and her son. **Id.** These charges were held for Court following a Preliminary Hearing on June 5, 2012.

The firearm in question, later identified as a Mauser rifle, and the Defendant's possession thereof, subsequently lead to a federal investigation stemming from information initially given by victim/witness Gloria Soto. Multiple charges related to a murder-for-hire plot were brought against the Defendant in federal court. On August 21, 2013, following a three-day jury trial before the Honorable A. Richard Caputo, United States District Judge for the Middle District of Pennsylvania, the Defendant was convicted of Count 1 – Conspiracy to Use Interstate Facilities in the Commission of a Murder-For-Hire; Count 2 – Possession and Use of a Firearm During and in

3

Relation to a Crime of Violence; Count 3 – Receiving a Firearm with Intent to Commit a Murder; Count 4 – Possession of a Firearm by a Convicted Felon; and Count 5 – Attempting to Corruptly Persuade a Witness. The Defendant was sentenced on August 27, 2014, to be imprisoned for a total term of four hundred and twenty (420) months followed by a three (3) year term of supervised release.

Prior to trial in this matter, the Commonwealth filed a Motion to Bifurcate Trial because one of Defendant's charges, Possession of a Firearm Prohibited, in violation of 18 Pa. C.S.A. § 6105(a), was based on the allegation that the Defendant was prohibited from possession a firearm based on a Protection from Abuse Order signed by the Honorable Thomas J. Munley of the Lackawanna County Court of Common Pleas effective June 3, 2009 and expiring June 3, 2012. As the PFA was a required element of proof of the charge, but was also prejudicial to the Defendant, the Commonwealth requested that this Court bifurcate the trial as to that count. This Court granted the Motion to Bifurcate on April 23, 2015.

Through the course of the three-day trial commenced on June 15, 2015. Prior to opening statements and after argument and ruling on pretrial motions, this Court held an in camera competency examination of Xander Soto, the son of victim/witness Gloria Soto, and witness in this case. Xander was eight (8) years old at the time of the incident and eleven (11) at the time of trial. This Court questioned whether Xander knew why he was at the courthouse, and what it means to to testify. **N.T. June 15, 2015, p. 14.** Xander expressed an understanding that testify means to swear to tell the truth, and that the truth is a good thing, and that in contrast, falsely testifying is a bad thing, thereby expressing his consciousness of his duty to tell the truth. **Id. at 15.** Upon questioning by this Court, Xander further expressed that he understood the duty to testify truthfully against someone and that he would not lie to put someone in jail. **Id. at 16.**

4

Counsel did not ask any further questions, and this Court deemed Xander Soto competent to testify. **Id. at 17.**

The Commonwealth's first witness was Officer Nicholas Hurchick, a patrolman from the Scranton Police Department. **Id. at 42-43.** Officer Hurchick testified that he was working the 11 p.m. to 7 a.m. shift on May 29, 2012, and responded to the 911 call at the Valley View Terrace Apartment Complex. **Id. at 43-44.** Hurchick stated that the nature of the call was that there was a male at an apartment harassing individuals with a firearm. **Id. at 44.** Officer Hurchick further detailed the department's procedure for responding to a call of that nature, where they stage out the location and formulate a plan to approach the area safely. **Id.** The Commonwealth then introduced a photograph of a Google Earth view of the Valley View Terrace Apartment Complex, Building 13, Apartment E, to which Officer Hurchick testified was a fair and accurate depiction of the apartment complex on May 29, 2012. **Id. at 45.** Officer Hurchick showed the jury where the officers were located that night to stage the area on the map. **Id. at 46.** Officer Hurchick further explained that there was only one was in and out of the area and that a chain link fence surrounds the Valley View Apartment Complex. **Id. at 47.** Officer Hurchick testified that approximately ten (10) officers responded to the call, and then they began to surround the building of the incident in question. **Id. at 48.** The Commonwealth then introduced a photograph of Building 13, Apartment E, which Officer Hurchick stated was a fair and accurate representation of the front entrance of the building on May 29, 2012. **Id. at 50.** Officer Hurchick and his partner Patrolman Hoffsommer were at the corner of the building while the other officers were stationed at the other three corners of the building. **Id. at 50-51.** Officer Hurchick testified that they received a report from the Lackawanna County Communications Center that a shot had been fired inside the building and then observed a male exit the building and began running

5

toward him. **Id. at 51.** The man had a silver object in his hand, which turned out to be a can of a carbonated beverage that he threw at officers Hurchick and Hoffsommer. **Id.** Officer Hurchick testified that the man did not obey their commands to stop, and ran to the fence and jumped on it. **Id. at 52-54.** The man was unable to climb the fence, at which point the man complied, was handcuffed, and taken into custody. **Id.** Officer Hurchick personally handcuffed the man, who he identified as the Defendant in the courtroom. **Id. at 54-55.** On cross-examination, Officer Hurchick stated that he did not hear a gun shot fire while he was at the scene. **Id. at 56-57.**

The Commonwealth then called Allen Carney of Lackawanna County 911, who testified how the 911 call center system records incoming calls, how the system stores the calls, and what happens when the call center receives a request for a copy of a 911 call. **Id. at 58-59.** Mr. Carney further testified that he received the request for a copy of the May 29, 2012, call and made the CD copy of the call. **Id. at 59-60.** Mr. Carney stated that he had an opportunity to review the CD and it fairly and accurately represented the copy he made. **Id. at 60-61.**

The Commonwealth then called the victim, Gloria Soto. **Id. at 68.** Ms. Soto testified that 2012, she and her son Xander, who was eight (8) years old at the time, lived in Apartment 13 of Building E on 1040 Jannette Street in the Valley View Terrace Apartment Complex in Scranton, Pennsylvania. **Id. at 69-70.** She stated that the Defendant, then her boyfriend, stayed with them. **Id. at 70-71.** Ms. Soto described the layout of the apartment, stating the front door entered into the living room, after which was the kitchen with a back door exit. **Id. at 71.** She stated that the second floor had three bedrooms and bathroom, two bedrooms to the left and one bedroom and the bathroom on the right. **Id. at 72.** The Commonwealth then introduced photos of the apartment, which Ms. Soto stated fairly and accurately depicted the apartment as it appeared on May 29, 2012. **Id. at 73-74.** Ms. Soto testified that she had known the Defendant for

6

approximately twenty years, stating that they dated in the late 1990s for about two years, had no contact for 14 years, and then began dating again in 2010. **Id. at 74-77.** Soto testified that Defendant would stay at the apartment three to four nights a week. **Id. at 77-78.** Soto further testified that she and the Defendant had a "rocky" relationship, meaning that he was physically and verbally abusive at least once a week. **Id. at 78-79.**

Regarding the specific day of the incident, Soto testified that she and her son came home from the apartment of a friend who also lived in the apartment complex at around 8:00 p.m. **Id. 83-84.** Ms. Soto stated that when she arrived home the Defendant and two of his friends, Sean and Bob, were at the apartment, drinking and talking. **Id. at 84.** She stated that Xander went upstairs to take a bath and get ready for bed because he had school the next day. **Id. at 84-85.** She testified that later, the Defendant and his friends wanted to take her car to the store for more beer, to which Soto responded that she was tired of her car being treated like a taxi. **Id. at 84-85.** Soto stated that the Defendant became upset, started screaming at her, and took her car. **Id. at 85-86.** Ms. Soto testified that the Defendant and his two friends left for approximately twenty (20) minutes, and that only the Defendant and Sean returned. **Id. at 86.** Ms. Soto stated that when the Defendant returned, he told her he did not like that she disrespected him in front of his friends. **Id. at 86-87.** Ms. Soto stated that Sean told him to calm down and take a walk. **Id. at 87.** She said that Sean left, the Defendant was gone for approximately twenty minutes to a half hour, and she went upstairs. **Id. at 87-88.** Ms. Soto testified that she was watching the television in her bedroom when she heard the Defendant return and he was yelling and screaming downstairs. **Id. at 88.** Ms. Soto testified that the Defendant came barging upstairs and broke the bedroom door that she had locked. **Id. at 89.** Ms. Soto testified that that the Defendant was yelling at her to clean, and she said no because she was tired and going to bed. **Id.** Ms. Soto stated that she kept telling the

7

Defendant no, while sitting on the bed with her back against the wall. **Id. at 89-90.** Ms. Soto stated that the Defendant went into the cubby in her room, retrieved something, and when she looked up he had a gun pointed at her face. **Id.** Ms. Soto further explained the position she was sitting in on the bed in reference to a photograph of her room, and the layout of the upstairs of her apartment. **Id. at 90-94.** Ms. Soto testified that something hit her in the head, possibly a dresser drawer, but she would not be sure what it was because she was looking down. **Id. at 94.** Ms. Soto testified that she was looking down to avoid a confrontation when she felt a sharp pain toward the side of her forehead. **Id. at 95.** The jury was shown a photograph of the mark on Ms. Soto's forehead. **Id. at 95-96.** Ms. Soto testified that the Defendant was standing at the foot of the bed at the time she was struck in the forehead, and the object that she was hit with came from that area as well. **Id. at 96-97.** Ms. Soto further testified that the Defendant then began threatening her and her child. She specifically stated:

Q:    And what does he say?

A:    If you don't get up and clean right now, I'm going to F'in kill you.

Q:    Does he mention Xander?

A:    Yes.

Q:    What does he say?

A:    Later on after what he does he threatens to kill Xander too.

Q:    Okay, and do you remember what he said?

A:    And your fucking kid.

**Id. at 97.**

Ms. Soto then testified that she told the Defendant that she did not care anymore, she was physically tired and tired of the relationship. **Id. at 98.** At that point, according to Ms. Soto, the

8

Defendant goes into the small closet for the gun. **Id.** She stated that the Defendant also retrieved a bullet, loaded the gun, and aimed it at her. **Id. at 99.** Ms. Soto testified that that the Defendant told her to get up now or she was dead and fired the gun. **Id. at 100.** She stated that the gun was pointed at her but did not hit her, but instead hit the wall behind the left side of her head. **Id.** The jury was shown a photo of the bullet hole in the wall in reference to where Ms. Soto was sitting on the bed. **Id. at 100-101.** Ms. Soto testified that the Defendant was standing at the foot of the bed, approximate two to three feet from her when he fired the gun. **Id. at 102.** She stated that she has seen him fire the rifle before at a shooting range. **Id. at 102.** Ms. Soto then identified the gun presented by the Commonwealth as the one the Defendant used to fire at her. **Id. at 103.** Ms. Soto testified that although she knew that the Defendant had that gun, she initially told the police that she had never seen it before because she was scared because no firearms were allowed in the housing complex. **Id. at 104.** Ms. Soto stated that she informed the police that she knew of the gun on June 5, 2015, and allowed them to take the box the firearm came in from her apartment. **Id. at 105-106.**

Ms. Soto testified that while this incident was occurring, her son Xander was in his bedroom across the hall. **Id. at 106-107.** Ms. Soto stated that after the Defendant fired the gun, she went downstairs and started cleaning the living room. **Id. at 107.** She said that after approximately 10-15 minutes, the Defendant came downstairs without the gun. **Id.** Ms. Soto asserted that she finished cleaning the living room, she went back upstairs to the bedroom and called 911. **Id. at 108.** She stated that she did not call 911 immediately because she thought the Defendant would take her cellphone. **Id. at 108.** Ms. Soto said that the 911 dispatcher stayed on the phone with her until the building was secure. **Id. at 109.** She was on the phone with the 911 dispatcher for approximately 15 minutes, at one point the phone disconnected when she lost the

9

signal. **Id. at 109, 112.** While she was on the phone, the Defendant came back into her room, asked if she was okay and who she was on the phone with. **Id. at 109-110.** The 911 audio tapes were played and a transcript was published to the jury. Ms. Soto testified that the Defendant went downstairs and left. **Id. at 110, 115.**

Gloria Soto then testified that on June 5, 2015, after the Preliminary Hearing in this matter, she received a phone call from the Defendant. **N.T. June 16, 2015, at p. 4.** The Commonwealth presented evidence of sound clips and a transcript from the recorded conversation, which Ms. Soto said accurately represent the conversation. **Id. at 5.** Ms. Soto stated that she was still talking to the Defendant because she still cared about him and loved him. **Id. at 7-8.** The Commonwealth played a series of clips from the telephone conversation that took place on June 5, 3015. **Id. p. 6-11.** Ms. Soto testified that on June 8, 2012, Detective Tim Harding of the Scranton Police Department came to the apartment to search for the gun, which Ms. Soto said he found upstairs behind a dresser drawer. **Id. at 11-12.** Ms. Soto stated that she had not touched the gun and did not know where it was. **Id. at 12.** The Commonwealth then played more audio clips from a phone call Ms. Soto received from the Defendant regarding the gun on June 10, 2012. **Id. at 12-14.** Ms. Soto then testified regarding letters she received from the Defendant. **Id. at 17.** Although the envelope said it was from D Saggon, Ms. Soto stated that she knew it was from the Defendant because she knows his handwriting. **Id.** Ms. Soto read a portion of one of the letter that said the following:

> Q:   Gloria, could you read that part for me?
>
> A:   It says, "You have to do your part. Go to the DA or call her. Tell her that the gun was never pointed at you and I never made any verbal threats. The bump on your head we'll bring up later, happened when I came into the room and you turned into it. The cop said he saw it. That should leave only two charges."

**Id. at 18.**

10

Ms. Soto then testified that the Defendant was trying to get her to lie to the District Attorney's office, but reiterated that the gun was pointed at her, that the Defendant did verbally threaten her, and that the Defendant caused the bump on her head by hitting her with something. **Id. at 19.**

Ms. Soto read further portions of the letter that stated: "Make sure you say you're bipolar and whatever else you have." and "Tell them that when you're mad you embellish to get attention and you do not believe I could really hurt anyone like that." **Id. at 20.** Ms. Soto then read the portion of the letter that concluded:

> Please stick with that, okay. Please do not fuck me any further, baby. I love you and we don't need this shit. Please stop it, please, right now before it gets out of control. Tear this note up. Remember what I said. I miss you a lot and we'll write again later. I have to go to the mail list. Hopefully I did not miss the mail."

**Id.**

The Commonwealth then introduced another letter addressed to Ms. Soto from the Defendant. **Id. at 21.** Ms. Soto read portions of the letter in which the Defendant again told Ms. Soto to speak to the District Attorney about the case. **Id. at 23-24.** Ms. Soto further read portions of the letter in which the Defendant told her that if she did not start providing him money, he would believe something is wrong and break off communication. **Id. at 24.** The letter also stated "You best be cleaning that fucking house too, you lazy fuck." **Id.** Ms. Soto read another portion that stated:

> We don't need anymore outburst now, do we? If you were helping me like I begged you to I would not be here. It's time to grow up and stop being a lazy, filthy pig. I'm sorry but I can't be with you. I know when you begged me to work it out last time you refused to clean our house. Well, listen, on days you don't clean I won't cook, clean, fuck. Let's see how you like that. ha ha. If you eat that day you clean that day. Its that fucking simple. Otherwise I have to roll out.

**Id. at 25.**

The letter continued over several days of writing with the Defendant's complaints about Ms. Soto's cleaning, discussing his strategy for the case, again telling her to contact the District

Attorney. **Id. at 25-28.** The letter further stated "If asked anything further, Baby, baby plead the Fifth. Do not give her anything more than that. Nothing about rifle, X Man, threats, nothing, and you and I are good to go." **Id. at 29.** Ms. Soto testified that "X Man" was referencing her son Xander. **Id.**

The Commonwealth's fifth witness was Xander Soto, the son of Gloria Soto. **Id. at 78.** Xander was eleven years old at the time of trial. **Id. at 79.** Xander testified that in May of 2012, he was eight years old and living in the Valley View Terrace Apartment Complex with his mom and the Defendant, who was her boyfriend. **Id. at 82-83.** Xander testified that he thought the Defendant was a "pretty nice guy", and that the he enjoyed watching sports events with the Defendant. **Id. at 83-84.** Xander testified that he remembered the night the police came to the apartment and knew the police were there because the Defendant shot at his mother. **Id. at 85.** Xander testified that on the night of the incident, he went to bed when he got home around 8:00 p.m., but did not stay asleep the whole night. **Id. at 85-86; 91-92.** Xander stated that he woke up when he heard the Defendant shouting that he was going to kill Ms. Soto and Xander. **Id. at 86; 92; 95.** Xander testified that his door was open, and that after he heard the Defendant shouting at his mother, he heard the bang of a gunshot. **Id. at 86-87; 95.** Xander testified that he knew what a gunshot sounded like from movies. **Id. at 87.** Xander testified that he did not stay in his bed all night and that he left his room a few times to go to the bathroom. **Id. at 87-88.** Xander further stated each time was not to go to the bathroom, but because he heard the arguing and was being "nosy". **Id. at 88.** Xander testified that his mother did not see him come out of his room, but the Defendant did see him and yelled at him to go back into his room. **Id 88-89; 93-94.** Xander testified that he felt scared when he heard the Defendant yelling on the night of the incident and that he believed the Defendant when he said he was going to kill his mother. **Id. at 90-91**

12

The Commonwealth's sixth witness was Patrolman Christian Gowarty of the Scranton Police Department who is also an alternate or part-time member of the Crime Scene Unit. **Id. at 102-103.** Officer Gowarty detailed his experience, certifications, and training in the field of crime scene processing and evidence collection, and was called as an expert in crime scene processing and evidence collection. **Id. at 104-105; 106-108.** Officer Gowarty testified regarding his familiarity with firearms and bullets in both in his training and duties. **Id. at 110-111.** Officer Gowarty testified that he was on duty the night of the incident and responded to the scene. **N.T. June 16, 2015, at p. 111-112.** Officer Gowarty was informed that there may be evidence inside the apartment and was tasked with collecting, identifying and photographing evidence. **Id. at 113.** The jury was shown approximately fifteen (15) of the numerous photographs Officer Gowarty took of the apartment the night of the incident, including photographs of the bullet hole in the wall. **Id. at 114-116.** Gowarty testified that the one photo contained an unfired bullet in the sheets of the bed. **Id. at 116-117.** Gowarty further explained the difference between a cartridge, which contains a bullet, powder, and a primer, a bullet, the projectile itself, and the shell casing. **Id. at 117.** The jury was shown another photograph of another bullet that was found on the floor. **Id. at 118.** Officer Gowarty found an additional bullet under the bed, and testified that all bullets were 8mm Mausers. **Id. at 120.** Gowarty further testified that the officers at the scene recovered a spent casing prior to him arriving. **Id.** Officer Gowarty stated that they found a cooler in the living room with nineteen spent shell casings of the same type found in the bedroom. **Id. at 122.** Officer Gowarty also took a photograph of Ms. Soto's forehead to measure the size of the injury, which was bleeding. **Id. at 123.** Officer Gowarty testified regarding the layout of the house and how the upstairs bedrooms relate to the upstairs bathroom. **Id. at 124-125.** One photograph particularly showed a mark in the shower where the bullet struck the wall from the bedroom and

13

pushed the shower wall outward. **Id. at 125.** Officer Gowarty testified regarding one of the photographs showing the mark in the fiberglass of the shower measuring about four (4) inches from where the bullet struck the shower, through the wall shared by the bathroom and master bedroom. **Id. at 126.** Officer Gowarty testified that the three (3) bullets found in the bedroom and the spent shell casing matched the size and type of an empty box of ammunition labeled Remington Express Core-Lokt, 8mm Mauser, recovered from the bedroom. **Id. at 130.** Officer Gowarty further testified that they attempted to recover the bullet that was fired into the wall, but due to the wall structure and material, they were unable to recover it and stopped attempting to because the damage it was causing to Gloria Soto's apartment was too great. **Id. at 132.** Officer Gowarty concluded that the hole in the wall was a bullet hole based on its size, shape, the fact that it carried through the wall in a cone shaped fashion were all consistent with being a bullet hole. **Id. at 133-134.**

The Commonwealth then called Detective Sergeant Timothy Harding of the Scranton Police Department, who was then assigned to a task force of the Federal Bureau of Investigation. **Id. at 146-147.** Detective Harding testified regarding his June 8, 2012, search of Gloria Soto's home to look for the rifle. **Id. at 149**. He stated that while searching the apartment, he recovered and photographed a rifle found on the floor. **Id. at 149.** He stated that he found it after moving clothing around on the floor. **Id. at 149; 158.** Detective Harding stated that as continued searching, an FBI agent removed the dresser drawers and informed Harding that he could see bullets behind where the bottom drawer was. **Id. at 151; 160.** Detective Harding then laid on the floor to examine the bullets and saw the rifle behind both bottom drawers of the dresser. **Id.** Detective Harding stated that they found a plastic tray that can hold twenty (20) bullets but only contained sixteen (16). **Id. at 153; 157.** Detective Harding identified the Mauser rifle recovered

14

from the bedroom dresser and clarified that the Mauser rifle is a working replica of the World War II Mauser rifle made under the same German specifications as used prior to 1948. **Id. at 155.** He stated that a Mauser rifle uses 8mm bullets, and the bullets fit into the rifle he found, which he knew from testing the functionality of the rifle at the shooting range. **Id. at 155-156.** Upon cross examination, Detective Harding testified that from a photograph it appeared that one of the dresser drawers was broken. **Id. at 164.**

The Commonwealth next called Officer Frank McLane, a patrolman with the Scranton Police Department, who was working the C Shift, 11 p.m. to 7 a.m., on May 29, 2012. **Id. at 167-168.** He testified that on that night, he was conducting a traffic stop, which he broke off when he received the emergency call that there was a man with a shotgun in the Valley View Housing Project, and immediately proceeded to that location. **Id. at 169-171.** Officer McLane testified that he was receiving updates while in route to the scene and was informed that the weapon was a Mauser rifle.**Id. at 172-173.** Officer McLane was the first to arrive at the scene and waited at the entrance for approximately thirty (30) seconds for other officers to arrive. **Id. at 175-176.** He stated that officers established a perimeter and began searching for the suspect. **Id. at 177-178.** Officer McLane stated that the description he received from the communications center while on site was that the suspect was a male, approximately 5'10" with a bald head and goatee wearing a white shirt and jeans. **Id. at 179.** He was further informed that his name was Gary Williams. **Id. at 179-180.** Upon receiving a call from the communications center that the suspect may be fleeing, the officers engaged in a foot pursuit. **Id. at 181.** He further testified that they pursued the suspect while giving commands to stop, the K-9 was deployed, and the suspect stopped when he hit the fence and was taken into custody. **Id. at 182-183.** Officer McLane testified that he then spoke with victim/witness Gloria Soto who informed him that the Defendant was her boyfriend,

and that he struck her and shot at her. **Id. at 185.** Officer McLane obtained the written statement from Ms. Soto. **Id.** Officer McLane further testified that he was part of the team conducting the search on Ms. Soto's bedroom that night and he personally found the spent cartridge within the blankets on the bed and secured it. **Id. at 186-187.** Officer McLane testified that Ms. Soto told him that the Defendant came into the room with the rifle. **N.T. Trial, June 17, 2016, at p. 7.** Officer McLane stated that it was his understanding that Ms. Soto's son was upstairs at the time. **Id. at 8.** Officer McLane stated that on the night of the incident that Ms. Soto informed him that the Defendant struck her in the forehead multiple times with the butt stock end of the rifle. **Id. at 9-10.** Officer McLane testified that in his training and experience, on the night in question, Ms. Soto was visibly shaken and looked like someone who had been shot at. **Id. at 13.**

Outside the presence of the jury, counsel for both parties argued regarding the sufficiency of the evidence. **Id. at 17.** First, Defendant argued that the evidence was insufficient to establish Aggravated Assault under 18 Pa. C.S.A. § 2702(a)(1) under the totality of the circumstances. **Id. at 17-19.** Second, the Defendant argued regarding the sufficiency of the evidence regarding Aggravated Assault with a Deadly Weapon in violation of **18 Pa. C.S.A. § 2702(a)(4)**, stating that since the testimony does not establish what the object was, they cannot show it was a deadly weapon. **Id. at 19-20.** The Commonwealth argued regarding his intent, that he used the object to strike Ms. Soto in a vital part of her body, her head, thereby showing intent to cause serious bodily injury with an object. **Id.** The Commonwealth argued that her testimony regarding the sharpness of the object and the Defendant's letters referencing the gun and the bump on her head were sufficient for a jury to conclude it could be the butt end of the gun. **Id. at 21-22.** Defense counsel further argued that the evidence was insufficient to establish terroristic threats because of how the victim responded to the communications made by the Defendant, because he believes

16

that Ms. Soto did not perceive them as threats. **Id. 23-24.** The Commonwealth responded that it was his intent to terrorize by threatening to kill her and her son. **Id. at 24.** The Defendant additionally argued that the evidence was insufficient to establish the count of Recklessly Endangering Another Person with regard to Xander Soto because the boy was not in the room and the bullet would have had to travel through a wall to put him in danger. **Id. at 25-26.** The Defendant further challenged the sufficiency for the Simple Assault charge. **Id. at 26.** This Court denied the Defendant's Motions on the record. **Id. at 27.**

The Defendant then took the stand. **Id. at 30.** The Defendant testified that he lived with Gloria Soto since from approximately October 2010 until this incident on May 29, 2012, even though he was not on the lease. **Id. at 32; 53-54.** The Defendant testified that on May 29, 2012, he was drinking at the apartment with his friends Sean and Mary. **Id. at 33; 56.** The Defendant asserted that Gloria was there, but not drinking much and that she was becoming upset because she could not get high. **Id.** The Defendant stated that he and Gloria got into an argument when he and Sean decided to go to the store for more alcohol. **Id. at 34; 57-58.** The Defendant testified that Ms. Soto was becoming increasingly upset and yelling at him when he returned from the store. **Id. at 35-36.** He stated that he, Sean, and Mary left and went for a walk. **Id. at 37; 60.** The Defendant testified that after he returned approximately 30-40 minutes later, he did not say anything and began watching television. **Id. at 38; 61.** The Defendant testified that when Ms. Soto came out of her room, he went upstairs into the bedroom to talk to her and shut the door behind him. **Id. at 39; 62.** He testified that they began arguing while she was sitting on the bed and he was standing at the foot of the bed in front of the television. **Id. at 40.** The Defendant testified that as they were arguing, he pulled out the right bottom drawer of the dresser and was complaining about the cleanliness of the house. **Id. at 41.** The Defendant stated that he slammed

17

the dresser drawer on the floor, but did not throw it, or anything else, at Gloria Soto. **Id. at 42; 63.** The Defendant admitted that he was angry at the time. **Id. at 63-64.** The Defendant further testified that he did not retrieve the firearm or fire a weapon in the house that night. **Id. at 42-43.** The Defendant testified that the bullet hole was caused by him accidentally firing the gun after cleaning it a few weeks prior. **Id. at 43; 66-67.** The Defendant further testified that he did not remember threatening Ms. Soto during the argument and that he would never threaten her son. **Id. at 44.** The Defendant stated that the gun never left the dresser on May 29, 2012. **Id.** The Defendant stated that he then showered. **Id. at 46.** The Defendant said that after showering, he saw Xander in the hallway, explained to him that he and Gloria got into a fight, and told him to go back to bed. **Id.** The Defendant testified that Ms. Soto was downstairs cleaning when he went downstairs and began rolling cigarettes. **Id. at 47.** He stated that she went upstairs, and after some time, he did too. **Id. at 48.** The Defendant testified that he noticed Xander was awake still and again told him that he (the Defendant) and Ms. Soto got into an argument when Xander again asked what happened. **Id.** The Defendant testified that he went into the bedroom, thought it was unusual that the bedroom door was locked, and noticed that Ms. Soto was leaning out the window to get reception on her phone. **Id. at 49.** According to the Defendant, Ms. Soto turned and hit her head on the window frame. **Id. at 50.** When the Defendant realized she was on the phone with the police, he grabbed his shoes and a beer, and left. **Id. at 50-51.** The Defendant stated that he ran because of a prior bad incident he had with the police. **Id. at 51-52.** The Defendant further denied pointed a gun at Ms. Soto on May 29, 2012 and denied threatening to kill Xander Soto. **Id. at 52-53.** The Defendant admitted that the Mauser rifle was at Gloria Soto's house and that it was shipped to her residence intended for him. **Id. at 64-65.** The Defendant further testified that he would hide the rifle in different places around the house and in her car, including the kitchen and

18

the cubbyhole in the bedroom. **Id. at 65.** The Defendant further testified that the hole in the wall "was definitely caused by a bullet out of that rifle." **Id.** The Defendant further admitted that he had fired that rifle before, at a firing range, and that Ms. Soto was present, and that he was not an accurate shot. **Id. at 70-71.** The Defendant also testified that he threw the bullets on the bedroom floor because he wanted the police to know there was a gun in the house when he figured she would call them. **Id. at 72.** Finally, the Defendant testified that he was not abusive toward Ms. Soto and that Xander was lying. **Id. at 73-75.**

Following closing statements, jury instructions, and deliberation, the jury returned a verdict of Not Guilty on Count 1, Aggravated Assault in violation of 18 Pa. C.S.A. §2702(a)(1), and Guilty of Count 2, Aggravated Assault in violation of 18 Pa. C.S.A. §2702(a)(4), Counts 3 and 4, Terroristic Threats in violation of 18 Pa. C.S.A. §2706(a)(1), Count 5, Simple Assault in violation of 18 Pa. C.S.A. §2701(a)(1), Counts 6 and 7, and Recklessly Endangering Another Person, in violation of 18 Pa. C.S.A. §2705.

Immediately following the verdict, the Defendant decided to plead guilty to Count 8, Person Not to Possess or Control Firearms, in violation of 18 Pa. C.S.A. § 6105(a)(1). **Id. at 136.** This Court advised the Defendant of the rights he was giving up by entering a guilty plea and questioned whether his answers in his written four page guilty plea colloquy were true and correct. **Id. at 137.** The Defendant indicated to the Court that he was aware of the rights he was giving up, his answers were true and correct, and that he was satisfied with counsel. **Id.** The Defendant admitted that he was in custody of an 8 mm rifle which he used to commit a crime while ordered by Judge Munley not to possess a firearm. **Id. at 137-138.** This Court accepted the Defendant's plea and also found there was sufficient evidence to find the Defendant guilty of

19

Count 9, Harassment in violation of 18 Pa. C.S.A. § 2709(a)(1). **Id. at 138.** Sentencing was deferred for completion of a Presentence Investigation Report. **Id. at 138-139.**

On January 26, 2016, all parties appeared before this Court for sentencing in this matter. At the time of the sentencing hearing, the Defendant informed this Court that he wished to withdraw his guilty plea to Count 8, Person Not to Possess a Firearm. **N.T. Sentencing, January 26, 2012, at p. 2.** The Commonwealth asserted that recent case law would preclude the Defendant from doing that and argued that the Motion should be denied. **Id. at 2-3.** This Court denied the oral Motion, finding the request to be a dilatory tactic and implausible, and stated that it would issue a written opinion regarding this decision, which it did on February 5, 2016. **Id.** As such, this Court proceeded with sentencing. **Id. at 4-5.** When given the opportunity for allocution, the Defendant argued for suppression of the rifle, alleging that it was obtained in violation of his constitutional rights. **Id. at 5.** The Defendant additionally argued against the competency of Xander Soto, stated that this Court was impartial, and placed an on-the-record Notice of Appeal. **Id. at 5-6.**

This Court then sentenced Defendant as follows: On Count 2 – Aggravated Assault – two (2) years to five (5) years, six (6) months' incarceration in an SCI followed by two (2) years Special Probation to be supervised by State Probation; On Count 3, Terroristic Threats eleven (11) months' to two (2) years' in an SCI, followed by two (2) years Special Probation; Count 4 Terroristic Threats eleven (11) months, to two (2) years in an SCI followed by two (2) years' Special Probation; Count 5 – Simple Assault, merged with Aggravated Assault; Count 6, Recklessly Endangering Another Person eleven (11) months to two (2) years at an SCI; Count 7, Recklessly Endangering Another Person, eleven (11) months to two (2) years in an SCI; Possession of a Firearm Prohibited, eleven (11) months to two (2) years in an SCI, followed by

20

two (2) years' Special Probation; Count 9, Harassment, A determination of guilty without further penalty. All terms were ordered to run consecutive to each other and to the Defendant's federal sentence[1]. The aggregate punishment amounted to seventy-nine (79) months to one hundred eighty (180) months' followed by eight (8) years' State Probation. Defendant was given credit for eight hundred and twenty-one (821) days for the time he was in custody in Lackawanna County Prison from May 30, 2012 through August 28, 2014.

Defense Counsel then informed the Defendant of his Post Sentence Rights. Id. at 9. Defendant refused to sign the written copy of the Post Sentence Rights. Id. Defense Counsel immediately asked to withdraw as counsel, which this Court granted, and informed the Defendant that new counsel would be appointed for his appeal. Id. at 10.

On February 10, 2016, this Court appointed Dominic Mastri, Esquire as appellate counsel. No Post-Trial Motions were filed and Defendant timely appealed to the Superior Court on February 11, 2016. Thereafter, Attorney Mastri Petitioned to Withdraw as Counsel and this Court appointed Carl Poveromo, Esquire, Defendant's present counsel.

## DISCUSSION
### I.     SUFFICIENCY OF THE EVIDENCE

In his first matter complained of on appeal, Defendant asserts that the Commonwealth's evidence was insufficient to establish the elements of certain crimes charged in the Amended Information beyond a reasonable doubt. Defendant specifically takes issue with Count 2: Aggravated Assault in violation of **18 Pa C.S.A. § 2702(a)(4),** Counts 3 and 4: Terroristic Threats in violation of **18 Pa. C.S.A. § 2706(a)(1),** Count 5: Simple Assault in violation of **18 Pa. C.S.A.**

---

[1] The Defendant was sentenced by the Honorable A. Richard Caputo, United States District Judge for the Middle District of Pennsylvania, on August 27, 2014, to be imprisoned for a total term of four hundred and twenty (420) months followed by a three (3) year term of supervised release.

§ **2701(a)(1)**, and Counts 6 and 7: Recklessly Endangering Another Person in violation of **18 Pa. C.S.A. § 2705**. For the following reasons, based on a review of the record, the verdict should be upheld.

The standard of review regarding sufficiency of the evidence claims is well-established: "whether the evidence, viewed in the light most favorable to the Commonwealth, is sufficient to enable a reasonable jury to find every element of the crime beyond a reasonable doubt." **Commonwealth v. Laird, 988 A.2d 618, 624 (Pa. 2010)** citing **Commonwealth v. Watkins, 843 A.2d 1203, 1211 (Pa. 2003)**. See also **Commonwealth v. Rivera, 983 A.2d 1211, 1220 (Pa. 2009)**(whether viewing all evidence and reasonable inferences viewed in favor of the Commonwealth as verdict winner establishes all elements of the offense beyond a reasonable doubt).

Under this standard, the court

> may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

**Commonwealth v. DiStefano, 782 A.2d 574, 582 (Pa.Super.2001)** (citations omitted). As such, it is within the province of the jury as fact-finder to make credibility determinations and reasonable inferences from the evidence presented, believe some, all, or none of the evidence, and ultimately determine the guilt or innocence of the defendant. **Id.** See also. **Commonwealth v.**

22

**Gooding, 818 A.2d 546, 549 (Pa. Super. 2003).** The determination of the fact-finder is given deference.

In light of this standard, this Court will now address Defendant's sufficiency of the evidence claims.

The Commonwealth charged the Defendant with one (1) count of Aggravated Assault[2] based on the allegation that the Defendant struck the victim, Gloria Soto, in the head with an object. **See Amended Information, Count 2.** The Commonwealth charged the Defendant with two (2) counts of Terroristic Threats[3] based on the allegation that the Defendant communicated to victim, Gloria Soto, that he was going to kill her and her 8-year-old son while they were sleeping. **See Amended Information, Counts 3 and 4.** The Commonwealth charged Defendant with Simple Assault based on the allegation that Defendant the struck victim, Gloria Soto, in the forehead with an object. **Id. at Count 5.** The Commonwealth charged Defendant with two (2) counts of Recklessly Endangering Another Person based on the allegation that Defendant fire a singly 8 mm round from a bold action rifle in an apartment with victim Gloria Soto and victim Xander Soto present. **Id. at Counts 6 and 7.**

A person commits the offense of aggravated assault if he "attempts to cause or intentionally of knowingly causes bodily injury to another with a deadly weapon." **18 Pa. C.S.A. § 2702(a)(4).** A deadly weapon is defined as

> Any firearm, whether loaded or unloaded, or any device designed as a weapon and capable of producing death or serious bodily injury, or any other device or instrumentality which, in the manner in which it is used or intended to be used, is calculated or likely to produce death or serious bodily injury.

**18 Pa. C.S.A. § 2301.**

---

[2] **18 Pa C.S.A. § 2702(a)(4).**
[3] **18 Pa. C.S.A. § 2706(a)(1).**

23

Under Pennsylvania law, a "deadly weapon" does not necessary need to be an inherently lethal instrument; it is the use or intended use of the object that is significant. **Commonwealth v. McCullum, 602 A.2d 313, 323 (1992) citing Commonwealth v. Jones, 50 A.2d 317 (1947).** The Superior Court has stated:

> Items not normally considered deadly weapons can take on such status based upon their use under the circumstances. **Commonwealth v. Raybuck, 915 A.2d 125, 128 (Pa.Super.2006) (citing Commonwealth v. Scullin, 607 A.2d 750, 753 (Pa. Super. 1992) (finding tire iron thrown at victim was a deadly weapon),** *appeal denied,* **621 A.2d 579 (1992)); Commonwealth v. Cornish, 589 A.2d 718, 721 (1991) (fireplace poker used to strike victim constituted a deadly weapon); Commonwealth v. Brown, 587 A.2d 6, 7 (1991) (saw used to stab victim was a deadly weapon).**

**Commonwealth v. Rhoades, 8 A.3d 912, 917 (Pa. Super. 2010).**

A person commits the offense of terroristic threats in violation of 18 Pa. C.S.A. § 2706(a)(1), if he "communicates, either directly or indirectly, a threat to" "commit any crime of violence with intent to terrorize another." **18 Pa. C.S.A. § 2706(a)(1).** The Pennsylvania Superior Court has held that it is the intent of the actor that matters, not the ability to carry out the threat or whether or not the person being threatened believes the action will be carried out is an essential element. **Commonwealth v. Fenton, 750 A.2d 863, 865 (Pa. Super. 2000) citing Commonwealth v. Hudgens, 582 A.2d 1352, 1358 (1990) (quoting Commonwealth v. Anneski, 525 A.2d 373, 376 (1987),** *appeal denied,* **532 A.2d 19 (1987)).** The type of harm the Legislature intended to prevent in this statute is the "psychological distress that follows from an invasion of another's sense of personal security." **Id. quoting Commonwealth v. Tizer, A.2d 597, 600 (Pa. Super. 1996) (citing Hudgens, at 1358).**

A person commits the offense of Simple Assault in violation of 18 Pa. C.S.A. § 2701(a)(1), if he "attempts to cause or intentionally, knowingly or recklessly causes bodily injury to another." **18 Pa. C.S.A. § 2701(a)(1).** Bodily injury is defined as "impairment of physical condition or substantial pain." **18 Pa. C.S.A. § 2301.**

24

A person commits the offense of Recklessly Endangering Another Person (REAP) in violation of 18 Pa. C.S.A. § 2705 if he "recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury." **18 Pa. C.S.A. § 2705.** To sustain a conviction for REAP, "the Commonwealth must prove that the defendant had an actual present ability to inflict harm and not merely the apparent ability to do so. Danger, not merely the apprehension of danger, must be created." **Commonwealth v. Cianci, 130 A.3d 780, 782 (Pa. Super. 2015) quoting Commonwealth v. Hopkins, 747 A.2d 910, 915 (Pa.Super.2000) (internal citation omitted).** The Pennsylvania Superior Court has held that brandishing a loaded firearm during the commission of a crime provides a sufficient basis for a factfinder to conclude that a defendant had the requisite mental state and ability to inflict serious bodily injury necessary for a conviction of Recklessly Endangering Another Person. **Commonwealth v. Hopkins, 747 A.2d 910, 916 (Pa. Super. 2000) citing Commonwealth v. Peer, 684 A.2d 1077, 1080-1081 (Pa. Super. 1996).**

In this case, the evidence presented regarding Aggravated Assault in violation of **18 Pa. C.S.A. § 2702(a)(4),** viewed in light most favorable to the Commonwealth as verdict winner, was sufficient to establish the jury's finding that the Defendant was guilty of Aggravated Assault. As stated above, a person commits the offense of aggravated assault if he "attempts to cause or intentionally of knowingly causes bodily injury to another with a deadly weapon." **18 Pa. C.S.A. § 2702(a)(4).** A deadly weapon is an instrument or device used in or intended to be used, is calculated or likely to produce death or serious bodily injury. **18 Pa. C.S.A. § 2301.** In this matter, Gloria Soto testified that as they began arguing, the Defendant struck her in the forehead with an object. Ms. Soto specifically testified that something hit her in the head, possibly a dresser drawer, but she would not be sure what it was because she was looking down. **N.T. Trial,**

25

**June 15, 2015, at 94.** Ms. Soto testified that she was looking down to avoid a confrontation when she felt a sharp pain toward the side of her forehead. **Id. at 95.** The jury was shown a photograph of the mark on Ms. Soto's forehead. **Id. at 95-96.** The Commonwealth additionally introduced a letter from the Defendant to Ms. Soto in which he encouraged her to change her statement to the District Attorney's and suggested what she should say caused the mark on her head. Ms. Soto read a portion of one of the letter that said the following:

Q: Gloria, could you read that part for me?
A: It says, "You have to do your part. Go to the DA or call her. Tell her that the gun was never pointed at you and I never made any verbal threats. The bump on your head we'll bring up later, happened when I came into the room and you turned into it. The cop said he saw it. That should leave only two charges."

**N.T. Trial June 16, 2015, at p. 18.**

Additionally, Officer Gowarty testified regarding a photo he had measuring the injury on Ms. Soto's forehead. **Id. at 123.** Therefore, the evidence does show that Ms. Soto was struck in the head, a vital portion of her body, by a sharp object with enough force to cause signs of physical damage to her forehead. As such, the use of an instrument to knowingly cause, or attempt to cause, serious bodily injury can be satisfied in this case. Therefore, the evidence was sufficient to support the jury's verdict that the Defendant was guilty of Aggravated Assault.

The evidence presented regarding the two (2) counts of terroristic threats in violation of 18 Pa. C.S.A. § 2706(a)(1), viewed in favor of the Commonwealth as verdict winner, if believed by the jury, sufficiently establishes the elements of terroristic threats for both counts. As stated above, the Commonwealth charged the Defendant with two (2) counts of terroristic threats based on the allegation that the Defendant threatened to kill the victim Gloria Soto and her eight-year-old son, Xander, in his sleep. At trial, the Commonwealth presented two witnesses who testified that the Defendant yelled at Ms. Soto that he was going to kill her and her

26

son. At trial, Ms. Soto testified that after the Defendant started arguing with her and struck her in the head with an object, he told her "If you don't get up and clean right now, I'm going to F'in kill you" and later added "and your fucking kid." **N.T. Trial, June 15, 2015, at p. 95-97.** Ms. Soto testified that after threatening her and her son's lives, the Defendant retrieved a rifle from the small cubbyhole in the room, loaded in front of her and aimed it at her head. **Id. at 98-99.** Ms. Soto further testified that the Defendant told her to get up or she was dead and fired the gun. **Id. at 99-100.** Xander Soto similarly testified that upon waking up to the Defendant shouting, he heard the Defendant shout at his mother that the Defendant was going to kill her and him. **Id. at 85-86; 91-92; 95.** The testimony of these witnesses, if believed by the jury, and viewed in light most favorable to the Commonwealth, is sufficient to establish the elements of Terroristic Threats regarding the allegation that the Defendant threatened to kill Ms. Soto and her son. The testimony established (1) communication of a threat – Defendant's statements to Ms. Soto; (2) to commit a crime of violence – that he would kill her and her son; with the intent to terrorize another – established by the allegation that the Defendant struck Ms. Soto in the head and fired a rifle at her. Whether or not Gloria Soto believed that the Defendant would harm her or her son is not relevant, the issue is whether or not the Defendant's intent was to terrorize the victim. In this case, the evidence presented by the Commonwealth, viewed in light most favorable to it as verdict winner, supports the jury's finding that the Defendant was guilty of two (2) counts of Terroristic Threats.

The evidence presented by the Commonwealth also sufficiently supports the jury's determination that the Defendant was guilty of Simple Assault in violation of 18 Pa. C.S.A. § 2701(a)(1). As discussed above, a person is guilty of Simple Assault if they "attempts to cause or intentionally, knowingly or recklessly causes bodily injury to another." **18 Pa. C.S.A. §**

27

**2701(a)(1).** As discussed above regarding the Aggravated Assault, the evidence presented by the Commonwealth in this case sufficiently established that the Defendant struck the victim, Gloria Soto, in the head, with a sharp object, using enough force to cause visible damage to the area. As such, this evidence is sufficient to support the jury's finding that the Defendant was guilty of Simple Assault.

Finally, with reference to the two (2) counts of Reckless Endangering Another Person in violation of 18 Pa. C.S.A. § 2705 if he "recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury." Here, the evidence presented by the Commonwealth, viewed in its favor is sufficient to establish the charges of Recklessly Endangering Another Person, as the testimony demonstrated that the Defendant brandished a loaded firearm, while making threats on the lives of two individuals present in the residence, discharged the weapon into a wall adjoining the bathroom, a room in the house in which a person could have been present and struck. Therefore, such evidence, if believed by the jury, is enough to establish the requisite mental state and actions necessary for convictions of Recklessly Endangering Another Person in violation of 18 Pa. C.S.A. § 2705. **See Hopkins,** *supra.*

Therefore, because the evidence presented on each of the challenged charges, viewed in light most favorable to the Commonwealth as verdict winner, is sufficient to support the jury's guilty verdicts, the Defendant's convictions should be affirmed.

## II. THIS COURT DID NOT ABUSE ITS DISCRETION IN GRANTING THE COMMONWEALTH'S MOTION IN LIMINE REGARDING CHARACTER EVIDENCE AND DENYING DEFENDANT'S COUNTER MOTION.

Defendant's second issue on appeal asserts the following:

> The Trial Court committed legal error and/or abused its discretion in the following respects: (a) in granting the Commonwealth's Motion in Limine to introduce Rule 404(b) evidence, regarding Defendant's prior incidents of domestic violence against

28

Gloria Soto from August 2011, through May 2012, to show ill will, motive, intent and common scheme or plan and a chain or sequence of events to form the history of the case; (b) in allowing the Commonwealth to introduce evidence and testimony that Defendant had punched Gloria Soto in the face on a prior occasion to show an escalation of violence; and (c) in denying Defendant's Counter Motion in Limine to preclude the Commonwealth from introducing evidence regarding prior incidents of domestic violence because the evidence was limited to a single occurrence, and did not involve firearms or show a sequence of events, and the probative value of such evidence was far outweighed by its potential for unfair prejudice.

Upon review of the record, the motions and oral argument of the parties, and the applicable case law, this Court believes that the Commonwealth's Motion in Limine regarding Rule 404(b) evidence and the Defendant's Counter Motion in Limine were properly granted and denied, respectively.

Under Pennsylvania law, the admissibility of evidence is within the discretion of the trial court and will only be reversed upon showing a clear abuse of discretion. **Commonwealth v. Drumheller, 808 A.2d 893, 904 (2002)**, *cert. denied,* **539 U.S. 919, 123 S.Ct. 2284, 156 L.Ed.2d 137 (2003)** (quoting **Commonwealth v. Stallworth, 781 A.2d 110, 117 (2001)**); **Commonwealth v. Tyson, 119 A.3d 353, 357, appeal denied, 128 A.3d 220 (Pa. Super 2015)**. An abuse of discretion is more than an error in judgment; it is a misapplication of the law or a showing that the exercise of judgment was "manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." **Tyson, 119 A.3d at 357** quoting **Commonwealth v. Harris, 884 A.2d 920, 924 (Pa.Super.2005)**, *appeal denied,* **928 A.2d 1289 (2007)**.

"Relevance" is the threshold requirement for the admissibility of evidence. **Commonwealth v. Cook, 952 A.2d 594, 612 (2008)**. The Pennsylvania Rules of Evidence provide the guiding framework regarding the types of evidence that should and should not be admitted. Pennsylvania Rule of Evidence 401 provides the test for relevant evidence.

29

### Rule 401. Test for Relevant Evidence

Evidence is relevant if:

(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and

(b) the fact is of consequence in determining the action.

**Pa.R.E. 401.**

As the Court in **Drumheller** explained: "Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact." **Drumheller**, *supra* at 904.

The Rules of Evidence further state: "[a]ll relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." **Pa.R.E. 402.** Rule 403 explains limitations:

> The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

**Pa.R.E. 403.**

Rule 404 governs the admissibility of evidence regarding a person's character, other crimes or bad acts. Rule 404(b) is the provision specifically at issue in this case.

### Rule 404. Character Evidence; Crimes or Other Acts

. . .

**(b) Crimes, Wrongs or Other Acts.**

*(1) Prohibited Uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

*(2) Permitted Uses.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

*(3) Notice in a Criminal Case.* In a criminal case the prosecutor must provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence the prosecutor intends to introduce at trial.

30

**Pa.R.E. 404(b).**

As such, the admissibility of evidence of a prior crime, wrong, or other bad acts first depends upon the purpose for which it is being offered. Character or prior bad act evidence is not admissible for the purpose of demonstrating the defendant's propensity to commit crimes or to suggest that the defendant acted in conformity therewith. **Commonwealth v. Melendez–Rodriguez, 856 A.2d 1278, 1283 (Pa. Super. 2004).** However, such evidence can be admitted "in certain circumstances where it is relevant for some other legitimate purpose and not utilized solely to blacken the defendant's character." **Id.** Specifically, other crimes evidence is admissible if offered for a non-propensity purpose, such as proof of an actor's knowledge, plan, motive, identity, or absence of mistake or accident. **Commonwealth v. Tyson, 119 A.3d 353, 357–60, appeal denied, 128 A.3d 220 (Pa. 2015) (citing Commonwealth v. Chmiel, 889 A.2d 501 (2005).** If such evidence is offered for a legitimate purpose, the evidence of prior bad acts is admissible if the probative value outweighs the risk of unfair prejudice. **Id. citing Commonwealth v. Hairston, 84 A.3d 657 (2014),** *cert. denied,* —— U.S. ——, **135 S.Ct. 164, 190 L.Ed.2d 118 (2014).**

As discussed above, Rule 403 limits the court from allowing otherwise admissible evidence for several factors such as confusing the issues, needless delay, and undue prejudice. **See Pa. R. E. 403.** "'Unfair prejudice' means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." **Commonwealth v. Dillon, 925 A.2d 131, 141 (2007) (quoting Pa.R.E. 403** *comment* **).**

> Evidence will not be prohibited merely because it is harmful to the defendant. This Court has stated that it is not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged. Moreover, we have upheld the admission of other crimes evidence, when

31

relevant, even where the details of the other crime were extremely grotesque and highly prejudicial.

**Tyson, 119 A.3d at 360, appeal denied, 128 A.3d 220 (Pa. 2015)(citing Dillion, 925 A.2d at 141).**

Moreover, when making a balancing determination of the probative value versus risk for unfair prejudice, a cautionary jury instruction "may ameliorate the prejudicial effect of the proffered evidence.... Jurors are presumed to follow the trial court's instructions." **Id.** quoting **Hairston,** *supra* **at 666** (holding extraneous offense of arson was admissible under Rule 404(b) as res gestae evidence in prosecution for murder; trial court's instruction on how arson evidence should be considered minimized likelihood that arson evidence would inflame jury or cause it to convict defendant on improper basis).

In this matter, the Commonwealth filed a Motion in Limine to introduce Rule 404(b) Evidence regarding incidents of domestic violence committed against victim Gloria Soto, some of which were witnessed by victim Xander Soto, throughout the time period from August 2011 through May 2012. The Commonwealth intended to introduce the prior incidents of domestic violence to show Defendant's ill will, motive, intent, common plan or scheme in committing the criminal charges against the victims. Additionally, the Commonwealth argued that the evidence is admissible to demonstrate a chain and sequence of events, forming the history of the case, and showing an escalation of violence in the relationship of the Defendant and the victim Gloria Soto. The Commonwealth relied on **Commonwealth v. Drumheller**, in which the Court allowed testimony of three (3) prior Protection from Abuse Orders, and witness testimony regarding the parties' relationship to show the Defendant's ill will or malice and to form a history of the case. See **Commonwealth v. Drumheller, 808 A.2d 893 (Pa. 2002).**

32

The Court issued a written Order on June 16, 2015, granting the Commonwealth's Motion in Limine to Introduce 404(b) Evidence, in such, that the Commonwealth was allowed to introduce evidence of Defendant's prior incidents of domestic violence against the victim limited to the time period of August 2011 through May 2012 to show ill will, motive, intent, and common scheme or plan, as well as chain of sequence of events to form the history of the case. **See Order June 16, 2015.**[4] This Court further ordered that it would issue a cautionary instruction to the jury. **Id.**

At trial, victim/witness Gloria Soto gave testimony that the Defendant was verbally and physically abusive at least once a week throughout their relationship. **N.T. Trial, June 15, 2015, p. 77-79.** She further testified regarding a specific incident that her young son witnessed in which she claimed the Defendant punched her in the face. **Id. at 80.**

Following Gloria Soto's testimony, this Court issued the following cautionary instruction to the jury:

> Ladies and gentlemen, while the witness was testifying we heard some evidence regarding prior bad conduct on the part of Mr. Williams, that including prior references of domestic violence that was allowed into the record. I had permitted this evidence to be admitted into the record not as evidence that he committed these offenses for which he's on trial today but as evidence that was entered in respect to prior bad conduct solely and only for the purpose of the Commonwealth attempting to prove malice, motive and intent to show the chain and sequence of events on the part of Mr. Williams, and that is for the limited purpose for which the bad conduct as part of today's testimony is entered into the record.

**N.T. Trial, June 16, 2016 at 35-36.**

As such this Court did not err nor abuse its discretion in admitting the testimony of Gloria Soto regarding the escalating nature of her relationship with the Defendant. Therefore, this Court properly granted the Commonwealth's Motion in Limine and denied the Defendant's Counter

---

[4] This Court's June 16, 2015, Order also disposed of the Defendant's Supplemental Motions in Limine not at issue in this appeal.

Motion in Limine regarding the admissibility of testimony of Defendant's prior bad actions under Pennsylvania Rule of Evidence 404(b).

### III. THIS COURT PROPERLY DENIED DEFENDANT'S ORAL MOTION TO WITHDRAW GUILTY PLEA TO PERSON NOT TO POSSESS OR CONTROL FIREARMS AND SENTENCED THE DEFENDANT ON THE SAME, AS IT IS SEPARATE PUNISHABLE OFFENSE THAN DEFENDANT'S FEDERAL CHARGE.

Defendant's third issue on appeal challenges this Court's denial of Defendant's oral motion to withdraw his guilty plea to Person not to Possess of Control Firearms in violation of 18 Pa C.S.A. §6105(a)(1), as well as challenging this Court's ability to sentence the Defendant on that charge. Defendant specifically argues:

> The Trial Court erred and abused its discretion in denying Defendant's oral motion placed on-the-record in open court before sentencing to withdraw his guilty plea to the charge of Persons not to Possess or Control Firearms, 18 Pa C.S.A. 6105(a)(1), and in sentencing Defendant on such charge, because prosecution was barred by 18 Pa C.S.A. 111, and by the double jeopardy clauses of Article 1, 10 of the Pennsylvania Constitution and the Fifth Amendment to the United States Constitution, in that Defendant's prior federal conviction for Unlawful Possession of a Firearm, in violation of 18 U.S.C. 922(g)(1), is substantially the same as the crime of Persons not to Possess or Control Firearms, 18 Pa. C.S.A. 6105(a)(1), and the charges arose from the same offense conduct.

This Court believes that Defendant's assertion is incorrect. Defendant's convictions in this Court under Pennsylvania Law and in Federal Court under Federal Law do not violate 18 Pa. C.S.A. § 111 or the Double Jeopardy Clause of Article 1, 10 of the Pennsylvania Constitution and the Fifth Amendment to the United States Constitution.

Both the Double Jeopardy Clause of Article 1, Section 10 of the Pennsylvania Constitution and the Fifth Amendment to the United States Constitution bars prosecution for the same offense arising from the same conduct. The Pennsylvania Legislature expanded upon these constitutional rights by enacting 18 Pa. C.S.A. § 109-111. Section 109 bars a second prosecution for the same conduct under the same statute. **18 Pa.C.S.A. § 109.** Section 110 bars subsequent

34

prosecution for the same conduct under a criminal episode but under a different statute. **18**

**Pa.C.S.A. § 110.** Section 111, the statute which Defendant asserts on appeal, prevents a second

prosecution for the same conduct that was prosecuted by another jurisdiction. Specifically,

Section 111 provides:

> **§ 111. When prosecution barred by former prosecution in another jurisdiction**
> When conduct constitutes an offense within the concurrent jurisdiction of this
> Commonwealth and of the United States or another state, a prosecution in any such other
> jurisdiction is a bar to a subsequent prosecution in this Commonwealth under the
> following circumstances:
>
> > (1) The first prosecution resulted in an acquittal or in a conviction as defined in
> > section 109 of this title (relating to when prosecution barred by former
> > prosecution for same offense) and the subsequent prosecution is based on the
> > same conduct unless:
> >
> > > (i)  the offense of which the defendant was formerly convicted or
> > > acquitted and the offense for which he is subsequently prosecuted
> > > each requires proof of a fact not required by the other and the law
> > > defining each of such offenses is intended to prevent a substantially
> > > different harm or evil; or
> > >
> > > (ii)  the second offense was not consummated when the former trial
> > > began.
> >
> > (2) The former prosecution was terminated, after the indictment was found, by an
> > acquittal or by a final order or judgment for the defendant which has not been set
> > aside, reversed or vacated and which acquittal, final order or judgment necessarily
> > required a determination inconsistent with a fact which must be established for
> > conviction of the offense of which the defendant is subsequently prosecuted.

**18 Pa. C.S.A. § 111.**

If Section 111 were to apply to bar Defendant's prosecutions and convictions in both Federal and

State courts then it would be under Section 111(1). However, Section 111(1) does not entitle

Defendant to relief.

The Pennsylvania Appellate Courts have focused on three inquiries in determining the

applicability of Section 111(1). **Commonwealth v. Calloway, 675 A.2d 743, 747 (Pa.**

35

**Super.1996).** First, the court looks at whether the Commonwealth is attempting to prosecute the same conduct for which the defendant was prosecuted in another jurisdiction. **Commonwealth v. Traitz, 597 A.2d 1129, 1132–33 (1991); See also, Commonwealth v. Peoples, No. 325 EDA 2013, 2013 WL 11248354, at \*6 (Pa. Super. Ct. Dec. 11, 2013).** If yes, the court then must determine whether prosecution for each crime requires "proof of a fact not required by the other, and whether the law defining the Commonwealth offense is designed to prevent a substantially different harm or evil from the law defining the other jurisdiction's offense. **Commonwealth v. Scarfo, 611 A.2d 242, 257 (Pa.Super.1992),** *appeal denied,* **631 A.2d 1006 (1993)."**

**Commonwealth v. Peoples, No. 325 EDA 2013, 2013 WL 11248354, at \*6 (Pa. Super. Ct. Dec. 11, 2013.**

Here, Defendant's claim fails on the second inquiry, as each offense requires proof of an element that the other does not.

In this matter, Defendant pled guilty to one (1) count of Persons not to Possess or Control Firearms, 18 Pa C.S.A. § 6105(a)(1). Section 6105(a)(1) provides:

> **(a) Offense defined.--**
> (1) A person who has been convicted of an offense enumerated in subsection (b), within or without this Commonwealth, regardless of the length of sentence or whose conduct meets the criteria in subsection (c) shall not possess, use, control, sell, transfer or manufacture or obtain a license to possess, use, control, sell, transfer or manufacture a firearm in this Commonwealth.

**18 Pa. C.S.A. § 6105.**

Section 6105, Subsection (c)(6) further states:

> **(c) Other persons.--**In addition to any person who has been convicted of any offense listed under subsection (b), the following persons shall be subject to the prohibition of subsection (a):
> ...
>> (6) A person who is the subject of an active protection from abuse order issued pursuant to 23 Pa.C.S. § 6108, which order provided for the relinquishment of firearms during the period of time the order is in effect. This prohibition shall

36

terminate upon the expiration or vacation of an active protection from abuse order or portion thereof relating to the relinquishment of firearms.

**18 Pa. C.S.A § 6105.**

In this case, Defendant was charged with this offense based the allegation that, while prohibited under the Court Order of the Honorable Thomas J. Munley not to possess a firearm, the Defendant was in custody of an 8mm Mauser rifle which he used to commit a crime. **See**

**Information, Count 8.**

In contrast, the Federal charge for which Defendant was prosecuted in Federal Court was pursuant to 18 U.S.C. § 922(g)(1).

Section 922(g)(1) provides:

> **(g)** It shall be unlawful for any person--
> **(1)** who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;

**18 U.S.C. § 922(g)(1).**

As such, the basis for the charge would be contained in an individual's criminal history. Defendant has a lengthy criminal history dating back to the mid-1980s. Although this Court cannot state with specificity the action taken by another Court, a review of the Defendant's criminal record shows multiple violations that may have supported the federal charge. For example, in Pike County, under CP-52-CR-0000168-2003, Defendant was sentenced to 6 to 23 months after pleading guilty to a Simple Assault (M2) charge and under Docket Number CP-52-CR-0000051-2004, Defendant entered a guilty plea to one (1) count of Terroristic Threats (M1) was sentenced to 11 ½ months to 23 months' imprisonment.

As such, each of these offenses required proof of a fact that the other did not. One was based on the Defendant's ban on possessing a Firearm in violation of 18 U.S.C. 922(g)(1() because of his felon status under Federal law. His charge in this case was based on the fact that he

37

was possession of a firearm in direct violation of a Protection from Abuse Order issued by the Honorable Thomas J. Munley of this Court. Therefore, as the offenses are distinguishable, sentencing the Defendant in this Court for an offense he committed in violation of a Pennsylvania law does not violate 18 Pa. C.S.A. § 111 or the Double Jeopardy Clause of Article 1, 10 of the Pennsylvania Constitution and the Fifth Amendment to the United States Constitution.

Therefore, this Court properly denied Defendant's Oral Motion to Withdraw his Guilty Plea and sentenced the Defendant under 18 Pa. C.S.A. § 6105(c)(6).

## IV. THIS COURT PROPERLY DENIED DEFENDANT'S ORAL MOTION TO WITHDRAW HIS GUILTY PLEA TO THE CHARGE OF PERSONS NOT TO POSSESS OR CONTROL FIREARMS, 18 PA. C.S.A. 6105(A)(1).

Defendant's fourth issue raised on appeal asserts:

> The Trial Court erred and abused its discretion in denying Defendant's oral motion placed on-the-record in open court before sentencing to withdraw his guilty plea to the charge of Persons not to Possess or Control Firearms, 18 Pa. C.S.A. 6105(a)(1), because Defendant offered fair and just reasons for the withdrawal of his guilty plea, amounting to an assertion of innocence, and the Commonwealth suffered no prejudice.

As stated in this Court's February 5, 2016, Order denying Defendant's request, Defendant did not offer a fair and just reason for withdrawing his guilty plea and the Commonwealth would suffer substantial prejudice if Defendant was permitted to do so.

Under the Pennsylvania Rules of Criminal Procedure 591, it is within the court's discretion to allow a defendant to withdraw a guilty plea. **See Pa. R. Crim. P. 591.** If the defendant moves to withdraw a guilty plea prior to sentence, the Court must determine whether (1) there is a fair and just reason for the withdrawal and (2) a lack of substantial prejudice to the Commonwealth. **Commonwealth v. Hutchins, 638 A.2d 674, 676 (Pa. Super. 1996). See also Pa. R. Crim. P. 591, Comment.** There is no absolute right to withdraw a guilty plea.

38

**Commonwealth v. Flick, 802 A.2d 620, 623 (Pa. Super. 2002).** If there is no fair and just reason, the motion must be denied. **Pa. R. Crim. P. 591, Comment.**

In this case, the Defendant entered a guilty plea on June 17, 2015, to Person not to Possess a Firearm in violation of 18 Pa. C.S.A. 6105(a)(1) based on the allegation that the Defendant was in possession of a Mauser rifle while prohibited under Protection from Abuse Order issued by the Honorable Thomas J. Munley of the Lackawanna County Court of Common Pleas.

As stated in this Court's February 5, 2016, Order denying Defendant's Oral Motion to Withdraw his Guilty Plea, this Court found that the Defendant did not offer a fair and just reason for withdrawal of the guilty plea, and allowing such withdrawal would subject the Commonwealth to substantial prejudice. The Defendant was charged with nine (9) counts from the March 29, 2012 assault-related incident, including Count 8, Possession of a Firearm Prohibited, based on the Commonwealth's allegation that the Defendant was prohibited from possessing a firearm under a Protection from Abuse Order issued on June 3, 2009 and effective until June 3, 2012. Because evidence of the Protection from Abuse Order would be prejudicial if presented at trial, the Commonwealth field a Motion to Bifurcate Trial on April 17, 2015, regarding Count 8. In an effort to promote judicial efficiency, the Commonwealth requested that immediately following a verdict on the remaining counts, the Commonwealth would then present evidence relative to a factual basis on Count 8 without relitigating every fact in a new trial. Accordingly, on April 23, 2015, this Court granted the Commonwealth's request.

Trial Commenced on June 15, 2015 and concluded on June 17, 2015. During trial, the Defendant provided the following testimony:

> The hole was caused by a bullet fired out of that gun, it was three weeks earlier just before I broke my hand. I was cleaning the gun downstairs and I was playing around with the action after I cleaned out the barrel and stuff and I brought it upstairs and I threw it on the bed after I was playing with the action. I was downstairs playing with the action with a

39

live round because I had it lubed up so nice it was sliding in and out with one finger I could open the bolt, pull it out and it was like really, really smooth so I had no problem with it, I was playing with it. I was really impressed how the action was working [...] so I bring it upstairs, I throw it on the bed, I throw it on the bed, right? I go grab the gun, I grab it by the barrel with my left hand, my right hand, I reach down and I smack the trigger. The friggin' bullet went off, went into a wall in the corner of the room. It was 10:00 in the morning, there was nobody around.

**N.T. Trial, June 17, 2015, p. 43-44**

The Defendant further testified that the "gun" never left the dresser drawer on May 29, 2012. He stated: "It never came out of the dresser that night, the whole day. In fact, it stayed in that dresser from the time I put it in there three weeks earlier after the gun went off in the house. That gun going off in the house kind of freaked me out a little bit, you know, I wasn't about playing with it no more I was done with it." **Id. at 45.** Subsequently, the Defendant admitted that he possessed a Mauser rifle at his residence, and it was shipped to the residence for his use. **Id. at 64-65.** He further testified that he hide the rifle around the residence and placed the rifle in various locations, including the bedroom dresser, kitchen closet, and car trunk. Id. He also testified that he previously fired the rifle multiple times at a firing range. **Id. at 70.** Upon the completion of the Defendant's testimony, the jury deliberated and returned a verdict on Count 2, 3, 4, 5, 6 and 7. Thereafter, the Defendant pled guilty to Count 8, Possession of a Firearm Prohibited, **18 Pa. C.S.A. § 6105(a)(1).** At the time of the guilty plea, the Defendant completed an oral and written guilty plea colloquy. A review of the colloquy indicated that the Defendant was able to understand the questions and answer them correctly; and that he both fully understood the questions as well as his decision to plead guilty.

Moreover, over the course of three years, this Court observed the Defendant throughout various stages of pre-trial conferences as well as trial and became familiar with the Defendant's repeated use of dilatory tactics and attempts to manipulate the criminal justice system.

40

Furthermore, based upon Defendant's trial testimony as discussed above, this Court found the Defendant's bald assertion of innocence to be contradictory, implausible, and insincere. Therefore, this Court recognized that the Defendant was familiar with the criminal justice system and knowingly, intelligently, and voluntarily entered a guilty plea upon completion of his three (3) day jury trial. Additionally, this Court found that the Defendant's oral petition to withdraw his guilty plea on the day of sentence was merely used as a pretextual dilatory tactic to rid himself of counsel rather than as a lawful means of asserting innocence. **See Commonwealth v. Cole, 564 A.2d 203 (Pa. Super. 1989)** (a criminal defendant will not be permitted to play fast and loose with the guilty plea process in order to delay prosecution). The Defendant's claim was contradictory to his testimony during trial and the record belies his claim. **Commonwealth v. Tennison, 969 A.2d 572, 578 (Pa. Super. 2009).** As pointed to above, the Defendant admitted that he possessed a Mauser rifle at his residence. He testified that he cleaned and handled the rifle, practiced firing the rifle at the shooting range, moved and hid it in various locations, and did fire it in the residence. **N.T. June 17, 2015, p. 43-45, 64-65.** As stated in this Court's Order denying his oral Motion, the Defendant's trial testimony is the most telling of the Defendant's intentions and reflective of how the Defendant's assertion of innocence rings hollow. Therefore, this Court recognized that the Defendant's declaration of innocence wholly undermined its plausibility, particularly in light of the Commonwealth's strong evidentiary proffer at trial and the plea hearing. **Commonwealth v. Hvizda, 116 A.3d 1103, 1107 (Pa. 2015); Commonwealth v. Carrasquillo, 115 A.3d 1284, 1285 (Pa. 2015)**(a bare assertion of innocence as a basis for withdrawing a guilty plea, is not, in and of itself, a sufficient reason to require a court to grant such a request).

41

Also, the Defendant's timing of his claim was made approximately six (6) months after the tender of his plea and for the first time at sentencing allocution, only minutes before he was sentenced. In this Court's view, the timing of the Defendant's assertion of innocence diminished the legitimacy of the Defendant's claim and was made in an effort to delay and disrupt the prosecution, which did not demonstrate a fair and just reason for withdrawal of his plea. **Carrasquillo, 115 A.3d at 1287.**

At the time of trial, all of the Commonwealth's witnesses, jurors, and court personnel had been assembled. Specifically, witnesses were present at the courthouse on the trial date and had to take leave from work to testify at the trial. The Commonwealth was prepared to present factual evidence on Count 8, Possession of a Firearm Prohibited, 18 Pa. C.S.A. § 6105(a)(1), without relitigating every fact in a new trial and empaneling a second jury. As such, this Court found that substantial prejudice would result if the Commonwealth was forced to recall all of its witnesses for trial. **See Commonwealth v. Ross, 447 A.2d 943 (Pa. 1982)**(request to withdraw guilty plea was properly denied where the Commonwealth dismissed numerous key witnesses in reliance on plea); **Commonwealth v. Carelli, 454 A.2d 1020, 1026 (Pa. Super. 1982)** (trial court properly denied defendant's petition to withdraw guilty plea where Commonwealth's witnesses were present in court on the day set for trial and many of these witnesses had travelled great distances and taken leave from employment to be at trial).

Therefore, under those circumstances, and cognizance of the liberal discretion required in favor of the accused, this Court found that the Defendant failed to make some colorable demonstration that permitting withdrawal of his plea would promote fairness and justice. As such, this Court's denial of Defendant's oral Motion to Withdraw Guilty Plea should be affirmed.

## V. THIS COURT DID NOT ERR NOR ABUSE ITS DISCRETION IN DENYING DEFENDANT'S REQUEST TO PROCEED PRO SE.

Defendant's fifth issue on appeal asserts that this Court erred and abused its discretion in failing to hold a **Grazier**[5] hearing regarding Defendant's request to waive counsel, and in failing to allow Defendant to waive counsel and proceed *pro se* in his jury trial. At the time scheduled for Defendant's **Grazier** hearing, the Defendant initially attempted to hold his request to proceed *pro se* in abeyance until the outcome of his attorney's argument on a Motion in Limine. Upon further questioning by this Court, the Defendant indicated that he is unfamiliar with the Rules of Criminal Procedure and wished to take the weekend to familiarize himself. The Defendant never clearly and unequivocally informed this Court that he wished to proceed *pro se* nor that he was making a knowing, intelligent, and voluntary waiver of counsel. On the following Monday, at trial, the Defendant did not raise issue with defense counsel's representation. Moreover, in this Court's opinion, the Defendant's request to proceed *pro se* was an untimely request amounting to a tactic to delay the trial. No abuse of discretion nor error of law occurred.

The Right to Counsel in a criminal proceeding is a fundamental right guaranteed by the Sixth Amendment of the United States Constitution and Article One, Section Nine of the Pennsylvania Constitution. **Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); Commonwealth v. McDonough, 812 A.2d 504, 506 (Pa. 2002).** Similarly, under both the Federal and State Constitution, a criminal defendant's right to counsel includes the right to waive counsel and proceed pro se. **Id.** If a defendant wishes to proceed *pro se*, he must petition the court and follow the appropriate procedures for a valid waiver of counsel. **McDonough, at 506.** Pennsylvania Rule of Criminal Procedure 121 governs waiver of counsel. **Pa. R. Crim. Pro. 121.** The right to self-representation is guaranteed as long as the court determines that the defendant's waiver of counsel is knowing, voluntary, and intelligent. **Faretta, 422 U.S. at 835,**

---

[5] **Commonwealth v. Grazier, 713 A.2d 81, 82 (1998).**

43

**Commonwealth v. El**, 977 A.2d 1158, 1162-1163 (Pa. 2009). However, the right to waive counsel is not automatic; only clear, unequivocal, and timely requests trigger the inquiry into whether the waiver is knowing, voluntary, and intelligent. **Id.; See also, Commonwealth v. Grazier, 713 A.2d 81, 82 (1998)**(Pa. R. Crim. Pro. 121 colloquy only required in response to a timely and unequivocal request to proceed pro se);**Commonwealth v. Davido, 868 A.2d 431, 438 (2005), cert. denied, 546 U.S. 1020, 126 S.Ct. 660, 163 L.Ed.2d 534 (2005)**("in order to invoke the right of self-representation, the request to proceed pro se must be made timely and not for purposes of delay and must be clear and unequivocal.")

A request to proceed *pro se* is timely if it is asserted before "meaningful trial proceedings" have started. **Commonwealth v. El, 977 A.2d at 1163, Commonwealth v. Jermyn, 709 A.2d 849, 863 (1998).** In **El**, the Pennsylvania Supreme Court determined that in the context of the right to proceed pro se, "meaningful trial proceedings" include "when a court has begun to hear motions which have been reserved for the time of trial; when oral arguments have commenced; or when some other such substantive first step in the trial has begun." **Id.** at 1165, quoting **Commonwealth v. Dowling, 959 A.2d 910 (2008).**

In this case, Defendant's request to proceed *pro se* was placed on the record during the Wednesday, June 10, 2015, Final Pre-Trial Conference with trial scheduled for June 15, 2015 at 9:00 a.m. **See N.T. Final Pre-Trial Conference, June 10, 2015, p. 9**. Defendant made this request in the midst of the Commonwealth arguing a Motion in Limine regarding reference to Defendant's federal case, at which time Defendant began to disagree with his counsel. **Id. at 7-9.** This Court promptly scheduled the **Grazier** hearing for Friday, June 12, 2015, as to not cause unnecessary delay with the scheduled trial, as it was apparent to this Court that the request was a last-minute dilatory tactic. **Id. at 9-10.**

44

At the time of the scheduled **Grazier** hearing, Defendant stated "It appears that Mr. Brier [Defendant's Trial Counsel] started to argue this motion and I agree with his position and I would like him to continue to argue this motion and defer my application until after the hearing." **N.T., Grazier Hearing, June 12, 2015, p. 2.** Defendant further asserted on his waiver colloquy form and informed this Court on the record that he was not familiar with the Rules of Criminal Procedure. **Id. at 4.** The Defendant further suggested that Attorney Brier could help him with the Rules of Criminal Procedure. **Id.** This Court would not permit hybrid representation at trial. **Id.** The Defendant wanted to take the weekend to familiarize himself with the Rules of Criminal Procedure. **Id.** The Defendant never clearly and unequivocally informed this Court that he wished to proceed *pro se*. On the following Monday, at trial, the Defendant did not raise issue with defense counsel's representation. Moreover, this Court finds the untimely request to be a last-minute dilatory tactic on the part of the Defendant. The Defendant requested to proceed *pro se* during oral argument on the Commonwealth's Motion in Limine, on June 10, 2015, with trial scheduled for Monday June 10, 2015. At the time of his **Grazier** hearing, he stated that he wanted to defer his request until after his attorney finished arguing the Motion because he agreed with him at that point. At the time of trial, the Defendant did not request to proceed pro se and remained silent to defense counsel's continued representation. As such, Defendant's assertion that he did not receive a **Grazier** hearing is completely false. As such, this Court did not abuse its discretion by not permitting the Defendant to proceed *pro se*.

Therefore, this Court did give the opportunity for a **Grazier** hearing, and his request to proceed *pro se* was waived.

## VI.     THIS COURT PROPERLY ALLOWED WITNESS XANDER SOTO TO TESTIFY.

45

Appellant's sixth matter complained of on appeal challenges this Court's finding that

Xander Soto was competent to testify. Defendant argues the following:

> The Trial Court erred and abused its discretion in failing to consider evidence of taint and in finding that Xander Soto was competent to testify and in allowing said witness to testify for the Commonwealth where Xander Soto lacked the capacity to observe, perceive and recall events correctly and accurately and his testimony was tainted by outside sources.

Based upon a review of the record and applicable case law, this Court properly allowed

Xander Soto to testify.

Defendant filed several Motions regarding the competency of Xander Soto and requests

for a "taint hearing". [6] On March 12, 2014, this Court ordered that Defendant's Motion

Challenging the Competency of Witnesses Xander Soto and Gloria Soto would be examined at

the time of trial. At the time of trial, this Court found Xander Soto to be competent to testify.

The Pennsylvania Rules of Evidence govern the admissibility of witness testimony. Rule

601 regarding witness competency provides the following:

> **(a) General Rule.** Every person is competent to be a witness except as otherwise provided by statute or in these rules.
> **(b) Disqualification for Specific Defects.** A person is incompetent to testify if the court finds that because of a mental condition or immaturity the person:
> (1) is, or was, at any relevant time, incapable of perceiving accurately;
> (2) is unable to express himself or herself so as to be understood either directly or through an interpreter;

---

[6] Defendant first filed a pro se Motion on August 21, 2012, that this Court recognized as hybrid because Defendant was represented by Attorney Sandra Stepkovitch at the time. On September 26, 2012, Attorney Stepkovitch filed an Omnibus Pretrial Motion including a Writ of Habeas Corpus, Motion Challenging Competency of Witness Xander Soto and Request for Taint Hearing, and a Motion Challenging Competency of Witness Gloria Soto. On the same day, September 26, 2012, Attorney Stepkovitch filed a Motion to Withdraw as Counsel. On February 6, 2013, this Court appointed Attorney Jonathan Pietrowski as counsel. On February 21, 2013, Attorney Pietrowski filed a Motion to Withdraw as Counsel, attaching the Defendant's letter requesting him to do so. On March 11, 2013, this Court permitted Attorney Pietrowski to withdraw. On March 12, 2013, this Court appointed Attorney Christopher Osborne as counsel. On May 8, 2013, Attorney Osborne also filed an Omnibus Pretrial Motion including a Writ of Habeas Corpus, Motion Challenging Competency of Witness Xander Soto and Request for Taint Hearing, and a Motion Challenging Competency of Witness Gloria Soto. On July 31, 2013, Attorney Osborne was permitted to withdraw as Counsel and Attorney Joseph O'Brien was appointed. On October 2, 2013, Attorney O'Brien was permitted to withdraw as counsel and Attorney Paul Ackourey was appointed as counsel. On October 15, 2013, Attorney Stephen Turel was appointed as additional counsel to Attorney Ackourey. With each request of the Defendant for new counsel or Petition to Withdraw as Counsel, the Omnibus hearings were rescheduled.

46

(3) has an impaired memory; or

(4) does not sufficiently understand the duty to tell the truth.

**Pa.R.E. 601.**

Under Pennsylvania law, every witness is presumed to be competent to testify. **Commonwealth v. Moore, 980 A.2d 647, 649 (Pa. Super. 2009); Pa. R. E. 601(a).** The burden of proving incompetency to testify is that of the objecting party. **Commonwealth v. Koehler, 737 A.2d (Pa. 1999).** It is within the court's discretion to determine whether or not a child is competent to testify and the determination will not be disturbed on appeal absent an abuse of discretion. **Id. citing In Interest of J.R., 648 A.2d 28 (1994); Commonwealth v. Short, 420 A.2d 694 (1980).** However, when a witness is a child under fourteen years old, the court must inquire into the mental capacity of the child, but discretion still rests with the court. **Commonwealth v. Hunzer, 868 A.2d 498, 507 (Pa. Super. 2005) quoting Commonwealth v. D.J.A., 800 A.2d 965, 969 (Pa.Super.2002) (citations and quotations omitted).** The test for competency of a child witness was provided by the Pennsylvania Supreme Court in **Commonwealth v. Rosche**:

> There must be: (1) such capacity to communicate, including as it does both an ability to understand questions and to frame and express intelligent answers, (2) mental capacity to observe the occurrence itself and the capacity of remembering what it is that she is called to testify about and (3) a consciousness of the duty to speak the truth.

**Rosche v. McCoy, 156 A.2d 307, 310 (1959)** (holding that "competency is presumed where the child is more than 14 years of age. Under 14 there must be a judicial inquiry as to mental capacity, which must be more searching in proportion to chronological immaturity.").

Moreover, in **Commonwealth v. Delbridge**, after extensive analysis of sister state case law, the Pennsylvania Supreme Court determined that in evaluating the competency of a child witness, a taint hearing may become necessary. **Commonwealth v. Delbridge, 855 A.2d 27, 39 (2003)**(discussing child victim/witnesses in sexual abuse cases). The Court in **Delbridge** defined

47

"taint" as the "implantation of false memories or the distortion of real memories caused by interview techniques of law enforcement, social service personnel, and other interested adults, that are so unduly suggestive and coercive as to infect the memory of the child, rending that child incompetent to testify. **Id. at 35.** The Court determined that taint is a proper inquiry at the competency evaluation, but the moving party must present some evidence to trigger an investigation of taint. **Id. at 40.** Specifically the **Delbridge** Court stated that a taint hearing is necessary when

> There is some evidence that improper interview techniques, suggestive questioning, vilification of the accused and interviewer bias may have influenced a child witness to such a degree that the proffered testimony may be irreparably compromised.

**Id. at 39.**

In this matter, the Court found that Xander Soto was competent to testify and that Defendant's allegation of taint did not rise to level requiring a taint hearing. Xander Soto was eight (8) years old at the time of the Preliminary Hearing and eleven (11) years old at the time of trial. Therefore, based on the witness's age, a competency hearing was necessary under the Pennsylvania Rules of Evidence. **See Pa. R. E. 601.** This Court conducted an on the record inquiry into the three necessary areas of competency for child witnesses: (1) the ability to understand questions and express intelligent answers; (2) the ability to observe and remember the event that the witness is called to testify about; and (3) a consciousness of the duty to tell the truth. **See Rosche,** *supra;* **Delbridge,** *supra.* This Court questioned whether Xander knew why he was at the courthouse, and what it means to testify. **N.T. June 15, 2015, p. 14.** Xander expressed an understanding that testifying means to swear to tell the truth, and that the truth is a good thing, and that in contrast, falsely testifying is a bad thing, thereby expressing his consciousness of his duty to tell the truth. **Id. at 15.** Upon questioning by this Court, Xander

48

further expressed that he understood the duty to testify truthfully against someone and that he would not lie to put someone in jail. **Id. at 16.** Counsel did not ask any further questions. **Id. at 17.** After conducting the inquiry, this Court determined that Xander Soto was competent and allowed him to testify. **Id.**

The Defendant's competency argument was based upon his allegation that Xander Soto was unable to accurately perceive the events of the night in question because the child remained in his room that evening and did not personally observe the interaction. **See Brief in Support of Omnibus, Attorney Osborne, p. 14.** The Defendant moreover baldly alleged that Xander Soto's memory was tainted by outside influences based upon his preliminary hearing testimony that he read about the incident in the newspaper and spoke to his mother, the Police, and Assistant District Attorney about the case. **Id. 14-15.** The Defendant failed to assert any evidence suggesting the testimony of Xander Soto was improperly compromised by outside influence.

This Court did not find that the Defendant presented evidence rising to the level of requiring a taint hearing. As such, this Court properly found Xander Soto competent to testify.

## VII. THIS COURT PROPERLY ALLOWED VICTIM GLORIA SOTO TO TESTIFY

Defendant's seventh issue on appeal challenges this Court allowing victim/witness Gloria Soto to testify. Defendant specifically asserts the following:

> The Trial Court erred and abused its discretion in failing to hold a hearing regarding Gloria Soto's competency to testify and in allowing said witness to testify for the Commonwealth because Gloria Soto could not perceive events accurately or remember them correctly due to her mental or emotional condition, use of antidepressant and psychotropic medications and illicit use of heroin.

Based upon a review of the record and applicable case law, this Court properly allowed victim Gloria Soto to testify.

49

As discussed above, Defendant filed several Motions regarding the competency of victim/witness Gloria Soto.[7] On March 12, 2014, this Court ordered that Defendant's Motion Challenging the Competency of Witnesses Xander Soto and Gloria Soto would be examined at the time of trial. At the time of trial, this Court found victim/witness Gloria Soto to be competent to testify.

As discussed in the previous section, the Pennsylvania Rules of Evidence govern the admissibility of witness testimony. Rule 601 regarding witness competency provides the following:

> **(a) General Rule.** Every person is competent to be a witness except as otherwise provided by statute or in these rules.
> **(b) Disqualification for Specific Defects.** A person is incompetent to testify if the court finds that because of a mental condition or immaturity the person:
>     (1) is, or was, at any relevant time, incapable of perceiving accurately;
>     (2) is unable to express himself or herself so as to be understood either directly or through an interpreter;
>     (3) has an impaired memory; or
>     (4) does not sufficiently understand the duty to tell the truth.

**Pa.R.E. 601.**

The Defendant argued that Gloria Soto should be deemed incompetent to testify based on her mental health diagnosis of bipolar disorder, anxiety, and depression, and medication for that illness that she was incapable of accurately perceiving the incident at issue.

As previously stated, every person is presumed competent to testify. **See Pa. R. E. 601.** As the party objecting to competency, the Defendant bears the burden of proving that Gloria Soto was incompetent to testify. Defendant's contention that Gloria Soto was incompetent to testify was based on his allegation that her mental health diagnosis and corresponding medications, as

---

[7] Defendant challenged the competency of Gloria Soto in the same Pretrial Motions discussed in the previous section under Footnote 6.

50

well as use of illegal drugs, rendered her incapable of accurately perceiving the events of the night in question.

However, under Pennsylvania law, the claims underlying of Defendant's assertions that Gloria Soto was incompetent to testify in fact go to the credibility of a witness, not the competency. The Superior Court has held that a witness's use of antidepressant drugs at the time of an event or thereafter is a question of credibility, not testimonial capacity. **See Commonwealth v. Boich, 982 A.2d 102 (Pa. Super. 2009).** Likewise, the Superior Court has additionally held that an allegation of intoxication also goes toward credibility, and was not an issue of capacity limitations. **See Commonwealth v. Collins, 70 A.3d 1245 (Pa. Super. 2013).** Credibility of a witness is to be determined by the fact-finder.

In this case, it was within this Court's discretion to permit victim/witness Gloria Soto to testify, as the Defendant did not meet his burden of establishing that she was incompetent to testify. The issues raised regarding Ms. Soto's mental health, medication, and drug use were issues of credibility to be determined by the factfinder, in this case, the jury. As such, this Court properly found Gloria Soto competent to testify.

## VIII. THE SENTENCE IMPOSED UPON DEFENDANT BY THIS COURT IS LEGAL, AND DEFENDANT RECEIVED THE APPLICABLE CREDIT FOR TIME SERVED.

Defendant's final issue on appeal contends that this Court imposed an illegal sentence. Specifically, Defendant contends:

> The Trial Court imposed an illegal sentence by directing that Defendant undergo confinement at a state correctional institution for an aggregate minimum term of 79 months' imprisonment to a maximum term of 120 months' imprisonment, followed by eight years' special probation, and by failing to give Defendant proper credit for time-served.

**Concise Statement, Para. 8.**

For the following reasons, Defendant is incorrect.

51

As discussed above, Defendant entered a guilty plea to one (1) count of Person Not to Possession of a Firearm Prohibited in violation of **18 Pa C.S.A. § 6105(a)(1)**. Defendant was then found guilty following a jury trial of one (1) count of Aggravated Assault (F2) in violation of **18 Pa. C.S.A. § 2702(a)(4)**, two (2) counts of Terroristic Threats with Intent to Terrorize Another (M1), in violation of **18 Pa C.S.A. § 2706(a)(1)**, one (1) count of Simple Assault (M2), in violation of **18 Pa. C.S.A. § 2701(a)(1)**, two (2) counts of Recklessly Endangering Another Person (M2), in violation of **18 Pa. C.S.A. § 2705**, one (1) count of Harassment – Subject Other to Physical Contact (S) in violation of **18 Pa. C.S.A. § 2709(a)(1)**.

On January 26, 2016, this Court sentenced Defendant as follows: On Count 2 – Aggravated Assault – two (2) years to five (5) years, six (6) months' incarceration in an SCI followed by two (2) years Special Probation to be supervised by State Probation; On Count 3, Terroristic Threats eleven (11) months' to two (2) years' in an SCI, followed by two (2) years Special Probation; Count 4 Terroristic Threats eleven (11) months to two (2) years in an SCI followed by two (2) years' Special Probation; Count 5 – Simple Assault, merged with Aggravated Assault; Count 6, Recklessly Endangering Another Person eleven (11) months to two (2) years at an SCI; Count 7, Recklessly Endangering Another Person, eleven (11) months to two (2) years in an SCI; Possession of a Firearm Prohibited, eleven (11) months to two (2) years in an SCI, followed by two (2) years' Special Probation; Count 9, Harassment, A determination of guilty without further penalty. All terms were ordered to run consecutive to each other and to the Defendant's federal sentence[8]. The aggregate punishment amounted to seventy-nine (79) months

---

[8] On August 21, 2013, following a three-day jury trial before the Honorable A. Richard Caputo, United States District Judge for the Middle District of Pennsylvania, the Defendant was convicted of Count 1 -- Conspiracy to Use Interstate Facilities in the Commission of a Murder-For-Hire; Count 2 – Possession and Use of a Firearm During and in Relation to a Crime of Violence; Count 3 – Receiving a Firearm with Intent to Commit a Murder; Count 4 – Possession of a Firearm by a Convicted Felon; and Count 5 – Attempting to Corruptly Persuade a Witness. The Defendant was sentenced on August 27, 2014, to be imprisoned for a total term of four hundred and twenty (420) months followed by a three (3) year term of supervised release.

to one hundred eighty (180) months' followed by eight (8) years' State Probation. Defendant was given credit for eight hundred and twenty-one (821) days for the time he was in custody in Lackawanna County Prison from May 30, 2012 through August 28, 2014.

The standard guideline range for Aggravated Assault (F2) in violation of **18 Pa. C.S.A. § 2702(a)(4)** is 18-24 months'. The statutory maximum is 120. The standard guideline range for Terroristic Threats with Intent to Terrorize Another (M1), in violation of **18 Pa C.S.A. § 2706(a)(1)**, is RS - <12 with a maximum of 60 months. The standard guideline range for Recklessly Endangering Another Person in violation of 18 Pa. C.S.A. § 2705 is RS -<12 with a maximum of 24 months. The standard guideline range for Possession of a Firearm Prohibited is RS - <12 with a maximum of sixty (60) months. As such, all sentences imposed by this Court were within the guidelines and statutory limits. Moreover, the decision to run sentences consecutively or concurrently is within the discretion of the trial court.

Although the Defendant does not specifically allege abuse of discretionary aspects of sentence, this Court will additionally address those as well for completeness of the record.

Initially, this Court notes that no automatic right of appeal exists for a challenge to the discretionary aspects of sentencing. Rather, this type of appeal is more appropriately considered a petition for allowance of appeal. **Commonwealth v. Rossetti, 863 A.2d 1185, 1193-1194 (Pa. Super. 2004) (citing Commonwealth v. Ritchey, 779 A.2d 1183, 1185 (Pa. Super.2001) (citations omitted)).**

Before reaching the merits of a discretionary sentencing issue, a court must ascertain whether an appellant (i) filed a timely notice of appeal, (ii) properly preserved the issue to be heard on appeal, (iii) filed a brief free of fatal defects, and (iv) raised a substantial question that the sentence appealed from is not appropriate under the

53

Sentencing Code. **Commonwealth v. Mastromarino, 2 A.3d 581, 588 (Pa. Super. 2010), cert. denied, 609 Pa. 685.**

A court evaluates whether a particular issue raises a substantial question on a case-by-case basis. **Commonwealth v. Rossetti, 863 A.2d 1185, 1194 (Pa. Super. 2004).** "[The court] will grant an appeal only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code or (2) contrary to the fundamental norms which underlie the sentencing process." **Commonwealth v. Brown, 741 A.2d 726, 735 (Pa. Super. 1999) (en banc).** The Pennsylvania Supreme Court has held that a claim regarding a sentence being excessive which is within the statutory limits can raise a substantial question, if the Appellant "sufficiently articulates the manner in which the sentence violates either a specific provision of the sentencing scheme set forth in the Sentencing Code or a particular fundamental norm underlying the sentencing process." **Commonwealth v. Mouzon, 812 A.2d 617, 627-28 (Pa. 2002).** However, the Pennsylvania Superior Court does not accept bald allegations of excessiveness. **Commonwealth v. Reynolds, 835 A.2d 720, 733 (Pa. Super. 2003).**

This Court believes that no substantial question exists as to Defendant's sentence, as the sentences imposed upon Defendant were within the statutory limits, the Court stated its reasons on the record for sentencing in the standard ranges, and the sentences conformed to sentencing norms, and were appropriate under the facts and circumstances of the case.

Even assuming Defendant's sentence is an appealable issue, this Court believes the sentence was appropriate and should be affirmed. The standard of review for discretionary aspects of sentencing is as follows:

It is well-established law that the sentencing function is a matter vested within the sound discretion of the sentencing court and will not be disturbed on appeal absent a manifest abuse of discretion. See **Commonwealth v. Walls, 926 A.2d 957, 961 (Pa. 2007).** "[A]n abuse of discretion is more than a mere error of judgment. ... [A] sentencing court will not have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." **Id.** (quotations omitted). "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." **Id., quoting Grady v. Frito–Lay, Inc., 839 A.2d 1038, 1046 (2003).** The rationale offered by the Pennsylvania Supreme Court for this deferential standard is as follows:

> Simply stated, the sentencing court sentences flesh-and-blood defendants and the nuances of sentencing decisions are difficult to gauge from the cold transcript used upon appellate review. Moreover, the sentencing court enjoys an institutional advantage to appellate review, bringing to its decisions an expertise, experience, and judgment that should not be lightly disturbed. Even with the advent of the sentencing guidelines, the power of sentencing is a function to be performed by the sentencing court. Thus, rather than cabin the exercise of a sentencing court's discretion, the guidelines merely inform the sentencing decision.

**Walls, 926 A.2d at 961-62 (citations omitted).** Furthermore, a sentence of confinement must be "consistent with the protection of the public, the gravity of the offense as it related to the impact on the life of the victims and on the community, and the rehabilitative needs of the defendant." **42 Pa.C.S. § 9721(b).** A sentencing court may

55

determine a defendant's potential for rehabilitation by considering his demeanor, apparent remorse, manifestation of social conscience, and cooperation with law enforcement agents. **Commonwealth v. Begley, 780 A.2d 605, 644 (Pa. 2001); Commonwealth v. Constantine, 478 A.2d 39 (Pa. Super. 1984); Commonwealth v. Gallagher, 442 A.2d 820 (Pa. Super. 1982).** Moreover, facts regarding the nature and circumstances of the offense that are not necessarily elements of the convicted offense, are proper facts to consider in deciding to sentence in the mitigated range or the aggravated minimum range. **Commonwealth v. Chilquist, 548 A.2d 272 (Pa. Super. 1988). See also, Commonwealth v. Darden, 531 A.2d 1144, 1149 (Pa. Super. 1987)** ("... facts regarding the nature and circumstances of the offense, which are not necessary elements of the offense for which appellant has been convicted, are also proper factors to consider in deciding whether to sentence in the mitigated minimum range, the aggravated minimum range, or outside the guidelines."). Additionally, trial courts are permitted to use prior conviction history and other facts already included in the guidelines, if they supplement other extraneous sentencing information. **Commonwealth v. Simpson, 829 A.2d 334, 339 (Pa. Super. 2003).**

It is also important to note that the decision to impose concurrent or consecutive sentences rests within the discretion of the sentencing court. **Commonwealth v. Johnson, 961 A.2d 877, 880 (Pa. Super. 2008)** (citing **Commonwealth v. Lloyd, 878 A.2d 867, 873 (Pa. Super. 2005).** See also, **Commonwealth v. Hoag, 665 A.2d 1212 (Pa. Super. 1995)**(stating an appellant is not entitled to a "volume discount" for his crimes by having all sentences run concurrently).

Under Pennsylvania law, the sentencing court has discretion to impose consecutive or concurrent sentences. **42 Pa.C.S.A. § 9721**. "In imposing a sentence, the trial judge may determine whether, given the facts of a particular case, a sentence should run consecutive to or concurrent with another sentence being imposed." **Commonwealth v. Wright, 832 A.2d 1104, 1107 (Pa. Super. 2003).** Moreover, the Court is under no obligation to impose the "minimum possible" confinement. **Walls,** *supra,* **at 965.** As stated above, bald challenges to discretionary aspects of sentencing do not raise a substantial question for appeal. "Generally speaking, the court's exercise of discretion in imposing consecutive, as opposed to concurrent sentences, is not viewed as raising a substantial question that would allow the granting of allowance of appeal." **Commonwealth v. Mastromarino, 2 A.3d 581, 586 (Pa. Super. 2010). See also, Commonwealth v. Moury, 992 A.2d 162, 171-72 (2010); Commonwealth v. Pass, 914 A.2d 442, 446-47 (Pa. Super.2006).**

A sentencing court's decision to impose consecutive, rather than concurrent, sentences does not generally raise a substantial question on appeal; however in extreme circumstances, such as when the aggregate sentence is unduly harsh when comparing the length of sentence imposed to the nature of the crime committed. **Commonwealth. v. Moury, 992 A.2d 162, 171 (2010) (citing Commonwealth v. Pass, 914 A.2d 442, 446-47 (Pa. Super.2006)).** For example, in **Commonwealth v. Treadway,** the Superior Court determined that the appellant failed to raise a substantial question when challenging trial court's imposition of an aggregate sentence of 100 to 200 years imprisonment for various sexual offenses. **Commonwealth v. Treadway, 104 A.3d 597, 600 (Pa. Super. 2014).** In imposing sentence, the sentencing court in **Treadway** considered the gravity of the

offenses, victim impact, the defendant's failure to rehabilitate, and the need to protect the public from the defendant. **Compare <u>Commonwealth v. Dodge</u>, 77 A.3d 1263, 1273 (Pa.Super.2013)** (holding appellant raised a substantial question that aggregate sentence of approximately 40 to 80 years of imprisonment was excessive where only low-value property crimes were involved).

It was within the discretion of the Court to impose concurrent or consecutive sentences. **42 Pa.C.S.A. § 9721**. In this Court's opinion, consecutive sentences, rather than concurrent sentences, was the more appropriate sentence given the nature of the offenses and the character and history of the Defendant As such, no abuse of discretion occurred.

In this matter, the Court had the benefit of reviewing the lengthy and detailed Presentence Investigation Report prior to imposing sentence. Therefore, this Court court had all relevant information regarding the Defendant's character and history prior to imposing sentence. Moreover, this Court had able opportunity to observe the Defendant throughout this case. This Court took into account the sentencing purposes and also looked to the punishment component of the sentencing and found it necessary in this case. Therefore, the Court adequately considered the goals of sentencing, as well as the Sentencing Guidelines, prior to imposing sentence.

This Court did not impose an excessive and harsh sentence in the Defendant's case. The sentence was appropriate under the facts and circumstances of the case and in light of the guidelines. As stated above, the decision to impose concurrent or consecutive sentences rests within the discretion of the sentencing court. **<u>Commonwealth v. Johnson</u>, 961 A.2d 877, 880 (Pa. Super. 2008) (citing <u>Commonwealth v. Lloyd</u>, 878 A.2d 867, 873 (Pa. Super. 2005).** The sentence imposed was within the Guidelines, the Court had

the benefit of a presentence investigation report, and the sentence imposed was otherwise within the discretion of this Court. As such, under the facts and circumstances of this particular case, this Court did not abuse its discretion in imposing sentence upon the Defendant.

Therefore, based upon the foregoing reasons, the sentence imposed by this Court was within the Guidelines, and was neither excessive nor harsh, and no abuse of discretion occurred.

Upon further review, it appears that the Defendant may be entitled to additional credit. Defendant was arrested on May 30, 2012 by the Scranton Police Department. He remained in Lackawanna County Prison in lieu of bail. On August 27, 2014, Defendant was sentenced in federal court to a total term of four-hundred and twenty (420) months' confinement followed by three (3) years' supervised release. Therefore, his original credit calculation stopped the credit accrual at that date, under the assumption Defendant began serving a legal sentence. However, as Defendant never left state custody, and upon being sentenced by this Court was sent to State Prison with a Federal Detainer lodged against him, it appears that he began serving this Court's sentence first. **See Lerario v. United States, 371 F.Supp. 633 (M.D. Pa. 2005).** This Court believes that this is the first time this issue had been brought to its attention. As such, if the Superior Court is in agreement, this Court will issue an Order granting the additional one hundred and fifty-two (152) days of credit toward Defendant's sentence.

## CONCLUSION

Accordingly, this Court's rulings were within its discretion, the jury's findings of fact were supported by the evidence. Moreover, the sentence imposed by this Court was appropriate

59

under the guidelines and given the facts and circumstances of this case. Therefore, the Defendant's convictions in this matter and this Court's January 26, 2016, Judgment of Sentence should be affirmed.

BY THE COURT:

_____, P.J.
Michael J. Barrasse

CC: Notice of the entry of the foregoing Opinion has been provided to each party pursuant to Pennsylvania Rule of Criminal Procedure 114 by mailing time-stamped copies to the following individuals:

Lisa A. Swift, Esq.
Lackawanna County District Attorney's Office
200 N. Washington Avenue
Scranton, PA 18503

Carl J, Poveromo, Esq.
Rinaldi & Poveromo, P.C.
520 Spruce Street
P.O. Box 826
Scranton, PA 18501